UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEDCENTER HOLDINGS INC., MEDCENTER SOLUTIONS SA, MED SOLUTIONS MÉXICO, S. DE R.L. DE C.V. AND MEDCENTER SOLUTIONS DO BRASIL SA,<br><br>                    Plaintiffs,<br><br>          v.<br><br>WEBMD HEALTH CORP., MEDSCAPE, LLC, and WEBMD GLOBAL LLC,<br><br>                    Defendants. | No. 20-civ-00053 (ALC)<br><br><br>Oral Argument Requested |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

*Of Counsel*:
Jeffrey A. Mitchell, Esq.
Stephen P. Farrelly, Esq.

BROWNE GEORGE ROSS LLP
5 Penn Plaza, 24th Floor
New York, New York 10001
Telephone:  (212) 413-2600
Facsimile:  (212) 413-2629
Attorneys for Defendants

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

FACTS RELEVANT TO THIS MOTION ....................................................................... 6

    A.    The First Amended Complaint (FAC) ................................................. 6

    B.    Material Omissions From The FAC .................................................... 9

ARGUMENT ............................................................................................................ 10

I.     STANDARD OF REVIEW ................................................................................. 10

II.    PLAINTIFFS' TRADE SECRET CLAIMS ARE UNTIMELY ...................................... 11

    A.    Aristu's Departure On June 6, 2019 Put Plaintiffs On Inquiry Notice ................ 12

    B.    Aristu's June And September Letters Put Plaintiffs On Actual Notice ................ 13

    C.    Continuing Wrong Doctrine Does Not Apply ....................................... 15

III.   NEITHER NEW YORK LAW NOR THE DTSA APPLY TO THE TRADE
       SECRET CLAIMS .......................................................................................... 16

    A.    New York Common Law Does Not Reach The Trade Secrets At Issue .............. 16

    B.    The DTSA Has No Extraterritorial Force Or Effect ................................ 18

IV.   PLAINTIFFS' CONTRACT CLAIM FAILS TO ALLEGE BREACH OR
       DAMAGES .................................................................................................... 20

    A.    Plaintiffs Do Not Allege Any Breach Of The NDA ............................... 21

    B.    Plaintiffs Allege No Damages Connected Solely To Breach Of The NDA ......... 22

V.    THE TRADE SECRET CLAIMS DO NOT STATE A CLAIM FOR RELIEF ............... 23

CONCLUSION .......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                                    Page(s)

*Accurate Grading Quality Assurance Inc. v. Thorpe*, No. 12-cv-1343, 2013 WL 1234836
(S.D.N.Y. Mar. 26, 2013) (Carter, J.) ...............................................................................11, 14

*Andrew Greenberg, Inc. v. Svane, Inc.*, 36 A.D.3d 1094 (3d Dep't 2007)...................................16

*ATSI Commc'ns Inc. v. Shaar Fund Ltd.*, 493 F.3d 87 (2d Cir. 2007) ........................................11

*AUA Private Equity Partners, LLC v. Soto*, No. 17-cv-8035, 2018 WL 1684339
(S.D.N.Y. Apr. 5, 2018).......................................................................................................23

*Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429 (E.D.N.Y. 2011)............................................14

*Barksdale v. Robinson*, 211 F.R.D. 240 (S.D.N.Y. 2002) ...........................................................14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...........................................................11, 16, 24

*Cockshaw v. Guar. Tr. Co. of N.Y.*, 282 A.D. 688 (1st Dep't 1953) ...........................................13

*Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353 (2d Cir. 2013) .....................................................13

*Convolve, Inc. v. Compaq Computer Corp.*, No. 00-cv-5141, 2011 WL 7144803
(S.D.N.Y. Oct. 6, 2011), *aff'd in part and rev'd in part*, 527 F. App'x 910
(Fed. Cir. 2013)....................................................................................................................21

*Cuba R.R. Co. v. Crosby*, 222 U.S. 473 (1912) ..........................................................................17

*E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441 (2018) ..............................................25

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162
(S.D.N.Y. 2011) ...................................................................................................................21

*Ellul v. Congregation of Christian Bros.*, 774 F.3d 791 (2d Cir. 2014) ......................................11

*Exceed Holdings LLC v. Chicago Board Options Exchange Inc.*, No. 17-cv-8078,
2018 WL 4757961 (S.D.N.Y. Sept. 30, 2018).....................................................................24

*Glob. Reinsurance Corp.-U.S. Branch v. Equitas Ltd.*, 18 N.Y.3d 722 (2012)...........................17

*Gordon v. Dino De Laurentiis Corp.*, 141 A.D.2d 435 (1st Dep't 1988)....................................22

*Inermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634 (N.D. Cal. 1993)......................................15

*Int'l Bus. Machs. Corp. v. Dale*, No. 11-cv-951, 2011 WL 4012399 (S.D.N.Y. Sept. 9, 2011)...22

*Kraus USA, Inc. v. Magarik*, No. 17-cv-6541, 2020 WL 2415670 (S.D.N.Y. May 12, 2020) .....25

CASES (cont.)                                                                    Page(s)

*M&T Chems., Inc. v. Int'l Bus. Machs. Corp.*, 403 F. Supp. 1145 (S.D.N.Y. 1975), *aff'd*, 542 F.2d 1165 (2d Cir. 1976) .................................................................................16

*Milan Music, Inc. v. Emmel Commc'ns Booking, Inc.*, 37 A.D.3d 206 (1st Dep't 2007) ............22

*Nelson Bros. Professional Real Estate LLC v. Jaussi*, No. 17-cv-0158, 2017 WL 8220703 (C.D. Cal. Mar. 23, 2017) ...........................................................................................19

*Optionality Consulting Pte. Ltd. v. Nekos*, No. 18-cv-5393, 2019 WL 4523469 (S.D.N.Y. Sept. 18, 2019) (Carter, J.)................................................................10, 11, 16

*Palomo v. DeMaio*, No. 15-cv-1536, 2017 WL 6001825 (N.D.N.Y. Dec. 4, 2017) ....................21

*Phx. Ancient Art, S.A. v. J. Paul Getty Tr.*, No. 17-cv-241, 2018 WL 1605985 (S.D.N.Y. Mar. 29, 2018) ..........................................................................................19

*RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016) ....................................................18

*Softel, Inc. v. Dragon Med. & Sci. Comm'ns, Inc.*, 118 F.3d 955 (2d Cir. 1997)..........................17

*Sonnesen v. Pan. Transp. Co.*, 298 N.Y. 262 (1948)....................................................................17

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835 (E.D. Va. 2017)............................19

*Tesla Wall Sys., LLC v. Related Cos., L.P.*, No. 17-cv-5966, 2017 WL 6507110 (S.D.N.Y. Dec. 18, 2017)..........................................................................................11

*TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.*, No. 19-cv-3283, 2020 WL 1322872 (S.D.N.Y. Mar. 20, 2020) ..........................................................................................16

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32 (2d Cir. 2019)........12, 16, 25

*Veronica Foods Co. v. Ecklin*, No. 16-cv-07223, 2017 WL 2806706 (N.D. Cal. June 29, 2017) ..........................................................................................25

*Zirvi v. Flatley*, 433 F. Supp. 3d 448 (S.D.N.Y. 2020), *appeal filed*, No. 20-546 (2d Cir. Feb. 12, 2020)................................................................................................11, 12

STATUTES

18 U.S.C. § 1831..........................................................................................................................19

18 U.S.C. § 1832..........................................................................................................................19

18 U.S.C. § 1832(a)(3)..................................................................................................................20

18 U.S.C. § 1836(b)(1) .................................................................................................................20

18 U.S.C. § 1836(d) .................................................................................................................12, 16

STATUTES (cont.)                                                                Page(s)

18 U.S.C. § 1837...................................................................................................19

18 U.S.C. § 1839(4)..............................................................................................23

18 U.S.C. § 1839(5)........................................................................................20, 23

Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836..................................4, 16, 19, 20

Economic Espionage Act of 1996, 18 U.S.C. §§ 1831-1839 ......................16, 18, 19, 20

RULES

Fed. R. Civ. P. 8(a)(2)...........................................................................................11

Fed. R. Civ. P. 12(b)(6).......................................................................................1, 10

OTHER AUTHORITIES

Guillermo Cabanellas, *Intellectual Property Law in Argentina* (4th ed. 2018)............18

*Offense*, Black's Law Dictionary (11th ed. 2019) ......................................................19

Defendants WebMD Global, LLC ("Global") and Medscape, LLC ("Medscape") are sister companies, both wholly owned by defendant WebMD Health Corp., a holding company ("WebMD Health") (collectively, "defendants").   Along with other affiliates, Global and Medscape are members of the *WebMD Health Network*, a "leading provider of health information to consumers, physicians and other healthcare professionals through its Websites, mobile apps and health-focused publications," WebMD Health Corp. Annual Report (Form 10-K) 1 (Mar. 1, 2017) (*cited in* First Am. Compl. ¶ 20[1]).   Defendants submit this memorandum of law in support of their motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the First Amended Complaint (the "FAC") filed in this action by plaintiffs Medcenter Holdings Inc., Medcenter Solutions SA, Med Solutions México, S. de R.L. de C.V. and Medcenter Solutions do Brasil SA (collectively, "plaintiffs" or "Medcenter"), with prejudice.

## PRELIMINARY STATEMENT

This case principally concerns the actions of non-party Mariel Aristu ("Aristu"), who lives and works in Argentina, and was hired by Global as an independent contractor consultant in June 2016 to sell Medscape branded products and services in Latin America.[2]   The FAC alleges that before she became a contractor for Global in Argentina, Aristu was the "second highest ranking executive of Medcenter."   ¶ 66.   No claim is made that she was bound by a restrictive covenant or non-compete which prevented her from consulting for Global, so this case is about whether Aristu improperly took anything with her when she left plaintiffs' employ.

---

[1]   References hereafter to paragraph numbers alone are to the First Amended Complaint, a copy of which is annexed to the accompanying Declaration of Jeffrey A. Mitchell, dated July 13, 2020 (the "Mitchell Declaration") as Exhibit 1.

[2]   The FAC misleadingly alleges in paragraph 140 that Aristu became "employed" by Global, but the "consulting agreement . . . dated as of June 10, 2016" referenced in that paragraph expressly provides that she is a "contractor."   *See* Mitchell Decl. Ex. 3.

The FAC alleges that over the 14 years of her employment, Aristu used portions of proprietary databases and other confidential information in doing her job.  Plaintiffs presume she retained copies of and then took portions of that material with her.  They also claim that Aristu knew so much about their business methods that plaintiffs' ultimate demise can only be attributed to her theft of trade secrets.  ¶ 10.  Putting aside that the loss of any top salesperson like Aristu will have negative economic ramifications, a claim for theft of trade secrets, if properly brought under New York or federal law, must be commenced within three years.  The factual allegations here show that if New York or federal law even applies, and not the laws of Argentina where the wrongs allegedly occurred, the statute of limitations on plaintiffs' trade secret claims (Counts I and II) started to run in 2016, and are time-barred.

The pleading identifies two databases maintained by Medcenter that are central to the trade secrets claims, one consisting of a 420,000 name list of physicians and health care professionals throughout Latin America (the "Physicians Database"), and the other called the Salesforce Customer Relationship Management database which memorialized details of business relationships and contacts (the "Salesforce Database").  ¶¶ 4, 40.  Aristu could not access either on her own.  "Not even the CEO of Medcenter Holdings and Medcenter Argentina, Daniel Sanmarco ('Sanmarco'), had access rights [to the Physicians Database]."  ¶ 42.  Those proprietary databases allegedly gave Medcenter "a unique competitive edge throughout Latin America, and provided Medcenter with "robust barriers to entry by competitors into that market."  ¶ 182.

Aristu "began her career" with plaintiffs in 2002, ¶ 67, and was throughout most of her tenure the common law wife of Sanmarco, with whom she lived in Buenos Aires for 10 years until 2013 and has a daughter, Mitchell Decl. Ex. 6, at 8:8-22.  Given both her many years at Medcenter and her romantic involvement with Medcenter's CEO, it is unremarkable that Aristu developed an

"intimate and long term insider knowledge about Medcenter's entire proprietary business strategy and operations throughout Latin America."  ¶ 3.  What is remarkable is that if she became so important as a result, plaintiffs never restricted her right to leave for a competitor.  The failure to do so is significant, as Aristu was free to consult with Global or anyone else, and to use her knowledge and experience.  While plaintiffs point to 2013 and 2014 consulting agreements signed by Aristu that allegedly "imposed express confidentiality obligations" on her, ¶¶ 94, 69, they have never sued her for breach of those agreements in Argentina despite what they now say is the extraordinary value of that information to them in Latin America, ¶¶ 1, 3, 4, 5, etc.

Plaintiffs certainly knew enough to file suit when they put "Aristu on notice of potential claims against her" on September 6, 2016, ¶ 158, more than three years before this case was filed. In her response on September 14, 2016, Aristu said she was perfectly free to use "commercial know how" learned while working for Medcenter, the very thing plaintiffs now call part of the "core bundle of [misappropriated] trade secrets," ¶¶ 160, 169.  Yet, plaintiffs did nothing in response to Aristu's statement, and instead disingenuously claim "the only realistic option was for Medcenter to be vigilant and, ultimately, wait and see what [happened]," ¶ 161, and that it was not until the "fall of 2017" when plaintiffs "came to suspect that Aristu . . . had disclosed or facilitated the disclosure of Medcenter's . . . confidential . . . information to the WebMD defendants."  ¶ 9. Nonsense.  If plaintiffs knew enough to put Aristu on formal notice in September 2016, they knew enough to file suit.

In truth, by the time they issued their September 2016 notice, the limitations period had already started to run.  These facts are admitted:

      a.     Aristu's niece, Estefania Aristu ("Estefania"), who worked for Medcenter for more than a decade, ¶ 61, was the "[o]nly" Medcenter employee other than Sanmarco

with full "access" rights to the Salesforce Database, ¶ 60.  She moved to "Medscape or WebMD Global" on April 15, 2016, ¶ 118, so the fact that aunt and niece were both working in Argentina for a competitor was known in June 2016 when Aristu joined her.

      b.    Sanmarco gave Aristu the Salesforce Database key in advance of a May 2016 industry conference in Miami, just weeks before she left for Global.  ¶¶ 128-131.

      c.    Aristu emailed Sanmarco on May 31, 2016 projecting receipt of $1.4 million in revenues from her projects by June 2016, ¶ 147, most of which did not then come in, ¶ 151.

Taking all of this together, plaintiffs were on inquiry notice of claims by June 2016, and actual notice by September 2016.  Indeed, the pleading is silent about what plaintiffs ever did to replace Aristu on her accounts to even try to maintain client continuity and compete for her business.

Even if not time-barred, neither New York nor federal law govern the trade secrets claims here.  Aristu worked for plaintiffs in Buenos Aires, the same place she currently provides contractor services for Global.  Even if secrets were taken and used unlawfully, that taking and usage occurred only in Argentina to service Latin American business exclusively.  Not a single act is alleged to have occurred in New York, so there is clearly no basis for plaintiffs to invoke New York common law at all.  The Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA") is equally inapplicable because its civil provisions do not apply extraterritorially.

The contract claim (Count III) against WebMD Health fares no better.  Plaintiffs allege that WebMD Health breached a mutual non-disclosure agreement dated March 3, 2014 between WebMD Health and Medcenter Holdings (the "NDA"), but none of their subsidiaries or affiliates. Mitchell Decl. Ex. 2 (FAC Ex. A).  The NDA was made in connection with a possible acquisition of Medcenter by WebMD Health, which never materialized.  ¶¶ 85-86, 107.  Plaintiffs claim

WebMD Health's breach was that it wrongfully disclosed "confidential information it learned about Medcenter's key employees and business model" to "its subsidiaries Medscape and WebMD Global." ¶ 218.  However, WebMD Health is the sole managing member of Global and Medscape, so the subsidiaries know what their parent knows, but the fact that neither was bound by the NDA is particularly significant.  Moreover, the NDA did not even prohibit the signatories to it from hiring employees of the others, let alone their subsidiaries or affiliates.

But, this employee information was not even confidential.  That is because immediately prior to entering into the NDA, plaintiffs admit that they and Medscape were parties to a Collaboration Agreement dated September 1, 2007 which ran to December 31, 2013. ¶ 73.  During the 6-1/2 year term of that agreement, the parties worked together on co-branded content that was distributed throughout Latin America *by plaintiffs*.  ¶¶ 74-77.  It was obviously the business relationship developed during the term of the Collaboration Agreement that led WebMD Health to consider an acquisition of Medcenter, and the FAC tellingly does not claim that Aristu's identity was a secret, let alone something WebMD Health only learned after the NDA was executed. Indeed, the FAC does not distinguish between what WebMD Health learned about plaintiffs' key employees and business model during the lengthy term of the Collaboration Agreement, as contrasted to during due diligence covered by the NDA.  During due diligence, WebMD Health was provided with reports on the status of projects, ¶ 78, but not access to any databases, ¶ 77.  So the only relevant breach of the NDA pled is the identity of Aristu and others and their job functions. Since the NDA explicitly excludes "information . . . that was available to the receiving party hereunder on a non-confidential basis prior to its disclosure by the disclosing party," Mitchell Decl. Ex. 2, at 1, this was not "confidential information."

Even had there not been a Collaboration Agreement, the identity and detailed job description of Aristu was publicly available on her LinkedIn profile, as was Estefania's. *See* Mitchell Decl. Exs. 4-5.[3]  Those profiles include not only name and job title, but granular descriptions of responsibilities, accomplishments, and in Estefania's case, even a written "Recommendation" by Sanmarco, posted publicly to her profile on August 23, **2011**, in which he calls her an "extraordinary helpful resource" who always finds the "smartest and simpler solution."[4]  *Id.* Ex. 4.  The identities and responsibilities of Aristu and Estefania were never confidential.

Third, plaintiffs allege that WebMD Health breached the NDA "by using confidential Medcenter employee information to poach key management personnel."  ¶ 158.  But no damages are specified that arise solely from the hiring of Aristu, separate and apart from the time-barred claims for theft of trade secrets.  The mere fact that Aristu and Estefania were hired, standing alone, is not enough.

Accordingly, the FAC should be dismissed

## **FACTS RELEVANT TO THIS MOTION**

A.   **The First Amended Complaint (FAC)**

The FAC is 58 pages long.  Its 221 numbered paragraphs, which include two overview sections called "Nature of the Action" and "Factual Background," meander back and forth in time and retell the same stories in different ways.  This needless length should not obscure the fact that

---

[3]    The FAC refers to the LinkedIn profiles, which are thereby incorporated by reference.  *See* ¶¶ 112-113.   Indeed, the FAC alleges that the LinkedIn profiles did not contain any detailed information.  This allegation is belied by the documents themselves.

[4]    Contrast that public compliment with this allegation in paragraph 121 of the FAC: "Significantly, Estafania [sic] had no skills other than what she had learned about the confidential Salesforce Database through her work at Medcenter."

there is almost no detail about what defendants, separate and apart from Aristu, did wrong.  Or the fact that when it comes to the most important allegations, they are almost always qualified by phrases like "would have been provided with," ¶ 94, "could only have known," ¶ 113, and "upon information and belief," ¶¶ 94, 97, 107, 117, 118 (3 times), 122, 123, 130, 139, 171, 174, 186.

Plaintiffs principally charge that defendants conspired with Aristu to steal their most valuable assets – in particular, their proprietary databases.  But nowhere do they claim that either was in fact downloaded and stolen in its entirety, nor do they allege those databases were later used by Aristu or how.  In cases like this, especially after having had four years to investigate, a pleading would ordinarily contain specifics, and not just conclusions, such as deals that were stolen, clients taken whose identities were a secret, or when and how trade secrets were taken and later used.  Instead, here there is a lot of innuendo and assumption, but no facts to enable the Court to determine whether *confidential information* was really taken.  The following summarizes the salient allegations in the FAC:[5]

- *Medcenter's Business Model, ¶¶ 28-30*: Founded in 1999, Medcenter provides continuing medical education to medical professionals in Latin America.  Through these education programs, Medcenter collects data on Latin American healthcare providers.  Its largest source of revenue comes from "Directed Projects," in which multinational pharmaceutical companies hire Medcenter to run targeted drug marketing projects based on the data collected during educational programs. Plaintiffs identify only one Directed Project that "never came to Medcenter," *see* ¶ 151, but no detail to show that any of Medcenter's Directed Projects were substantially similar to those of defendants, and if so, how.

- *Medcenter's Databases – Physician's Database, ¶¶ 31-44*: In addition to their names and identifying information, the database stores website usage statistics, individual doctors' prescribing patterns and preferred drugs.  Medcenter believes this data on prescribing patterns was its most valuable marketing asset.  Aristu had no access to the Physicians Database.  ¶ 42.  *Salesforce Database, ¶¶ 45-65*: This database contains information on all Directed Project clients, including all material contract details, pricing and contact information for decision makers.  According to

---

[5]     The Court's 25-page limit on briefing does not permit a paragraph-by-paragraph analysis of the 58-page FAC.  This summary provides an overview of the material allegations.

the FAC, Aristu had no access to this database either, other than one time in May 2016 (¶¶ 60-61, 128-131).  No claim is made that she copied the entirety of either database and took that with her, let alone delivered a copy to defendants.[6]

- *Role of Mariel Aristu, ¶¶ 66-72*: Hired by plaintiffs in 2002, Aristu rose through the ranks based on her "deep country specific knowledge and expertise in the pharmaceutical marketing sector."  ¶ 69   As part of her job, Aristu requested information from the Physician's Database on an as-needed basis "over an extended period of time." ¶¶ 71-72.  By June 2016, Aristu was the second highest ranking executive at Medcenter and a director at Medcenter Argentina.  ¶ 66  She was personally in charge of $2 million of Directed Projects and had oversight responsibilities over the remaining Directed Projects.  The FAC does not say what, if anything, plaintiffs did after Aristu left to maintain continuity with her clients in order to keep their business.

- *Collaboration Agreement Between Medcenter and Medscape, ¶¶ 73-80*: For 6-1/2 years from September 1, 2007 to December 31, 2013, Medscape and Medcenter worked together under the Collaboration Agreement.  Pursuant to that agreement, Medscape content was translated into Spanish and published on a co-branded website. The FAC ignores this prior business relationship altogether as the likely source for defendants' knowledge about plaintiffs' business methods, and the identity of key executives.

- *Medcenter Agreement with M3 USA, ¶¶ 81-84*: M3 USA, an alleged competitor of Medscape, paid Medcenter a flat fee to translate M3 content into Spanish and market that to Latin American doctors on its website.  This joint effort began in 2012.  Plaintiffs simply speculate that defendants were motivated by a fear of M3 to conspire with Aristu to steal plaintiffs' proprietary information.  ¶¶ 115-118.

- *WebMD Health/Medcenter Acquisition Negotiations and the NDA, ¶¶ 85-107*: From the spring of 2014 through June 2015, WebMD Health investigated a potential acquisition of Medcenter's Latin American subsidiaries which never materialized.  Prior to performing due diligence, WebMD Health and Medcenter executed a mutual NDA.  During due diligence, Medcenter allowed WebMD Health to see the structure of its databases, though not their content, and to *probably* review the contract details of Medcenter's key executives.  ¶¶ 89, 94.  Medcenter disclosed that its Directed Projects earned $11,434,724 from 2011 through mid-2014.

- *Efforts to Hire Medcenter Employees and Officers, ¶¶ 108-114*:  In July 2015, the Accounts Manager of Medcenter Mexico was solicited via email by Jeremy

---

[6]     All plaintiffs ultimately allege is that Aristu was "able" to access the databases to copy or create reports from them while working as head of their Latin American sales team, and this unspecified information was later disclosed to defendants.  ¶ 174.  This paragraph is the only one in the pleading that even uses the word "copy" in reference to proprietary information.

Schneider of WebMD.  Ultimately, the Accounts Manager was *not* hired, so there is no claim related to these allegations.

- *Defendants Hire Aristu and Estefania, ¶¶ 115-161*:  Plaintiffs allege that WebMD Health disclosed information about the Aristus to Global, and claim that Global used this information to target them for hiring.  Estefania was hired by Global in April 2016.  One month later, at an Eyeforpharma conference in Miami, Medscape and Global executives met with Aristu, allegedly to finalize the terms of her retention as a contactor.  In the time after the conference, Aristu allegedly "created multiple detailed reports" about Medcenter's pharma clients.  ¶¶ 133-135.  Shortly after the conference, Aristu left Medcenter, and plaintiffs learned from LinkedIn that she listed Medscape as the company with which she was now affiliated.  Plaintiffs reminded Aristu of her legal obligations in June 2016 to which she responded angrily that she had not been disloyal to Medcenter, had not caused it damages, and had not engaged in "unfair competition." ¶¶ 155-156.  Plaintiffs then exchanged letters with Aristu in September 2016 in which Medcenter threatened Aristu with legal action, and she responded that "her 'commercial know how' belonged to her." ¶¶ 158, 160.  Plaintiffs then did nothing until January 2020 when this suit was filed.

- *Medcenter's Attempts to Save Its Business, ¶¶ 162-178*:  In the fall of 2016, Medcenter's revenue from Directed Projects declined.  Medcenter only then supposedly began an investigation to determine whether Aristu had stolen any confidential information.  ¶ 164.  By October 2017, Medcenter learned that nine unidentified Directed Projects, which Aristu had overseen at Medcenter, had been taken over by one of the defendants.  ¶ 168.  Medcenter concludes with the assumption that trade secrets must have been stolen because it believes all of its pending Directed Projects were eventually taken over by defendants.  ¶ 175

**B.    Material Omissions From The FAC**

In the FAC's 221 numbered paragraphs, there is no mention of:

      a.    Whether defendants solicited trade secrets from Aristu.  In fact, the FAC does not claim anywhere that defendants requested, demanded, or asked for trade secrets from Aristu or anyone else, let alone that they were ever delivered to defendants.

      b.    The fact that Aristu is an independent contractor for, and not an employee of, Global, and her consulting agreement states that her work as a contractor "will not infringe, misappropriate, or violate the intellectual property rights or privacy rights o[f] any third party."  *See* Mitchell Decl. Ex. 3 ¶ 6(b).

c.      How, when, and in what manner defendants came into possession of the trade secrets.  Instead, the FAC speculates that defendants must have received trade secrets because it "would have been impossible" for them to compete otherwise.  ¶ 169.

d.      How, when, or in what manner defendants allegedly used the trade secrets.  Instead, it merely asserts in a conclusory manner that they must have done so.

e.      The 10-year common-law marriage between Sanmarco and Aristu or the fact that they have a child together.  In fact, the FAC is silent as to how Sanmarco could not have known what his former spouse did professionally while, according to plaintiffs' counsel at the pre-motion conference with this Court, they are amicably raising a child together and living across the street from each other. *See* Mitchell Decl. Ex. 6, at 8:14-22.

f.      Precisely what Medcenter said to Aristu in September 2016 that prompted her to deny engaging in "unfair competition," or what Medcenter accused Aristu of doing that prompted her to respond that her commercial know how "belonged to her."  In fact, the FAC omits mention of any of the facts that led to plaintiffs putting Aristu on formal written notice of potential claims in 2016.

g.      That defendants did not learn of Aristu and other executives during the term of the Collaboration Agreement, as it is clear that relationship led to the interest of WebMD Health to explore a possible acquisition of Medcenter just two months after expiration; and

h.      The contents of Aristu's or Estefania's LinkedIn pages.  The claim that they are devoid of job description details is contradicted by the pages themselves.

## ARGUMENT

## I.      STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "provide the grounds upon which [the] claim rests."  *Optionality Consulting Pte. Ltd. v. Nekos*, No. 18-cv-5393,

2019 WL 4523469, at *4 (S.D.N.Y. Sept. 18, 2019) (Carter, J.) (alteration in original) (quoting

*ATSI Commc'ns Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) and citing Fed. R. Civ.

P. 8(a)(2)).  To meet this standard, a plaintiff must allege "enough facts to state a claim to relief

that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint

that does not plead facts is not facially plausible.  A threadbare complaint provides no grounds on

which "to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Accurate Grading Quality Assurance Inc. v. Thorpe*, No. 12-cv-1343, 2013 WL 1234836, at *6

(S.D.N.Y. Mar. 26, 2013) (Carter, J.).   And while the Court must accept as true all factual

allegations in a complaint, a "pleading that offers 'only labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'"  *Optionality Consulting*, 2019 WL

4523469, at *4 (quoting *Twombly*, 550 U.S. at 555).

## II.   **PLAINTIFFS' TRADE SECRET CLAIMS ARE UNTIMELY**[7]

When a top salesperson leaves an employer for its competitor, a company typically does

everything it can to protect and retain the business formerly managed by that salesperson.  When

a top sales executive and her niece, who had access to the company's Salesforce Database, both

leave for the same competitor, a typical company would rush to its clients to cement existing

relationships, run a forensic analysis of computer records to see if anything was missing, and then

promptly seek an injunction if something was even slightly amiss.  Nothing of the sort happened

---

[7]      "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Ellul v. Congregation of Christian Bros*., 774 F.3d 791, 798 n.12 (2d Cir. 2014); *see also Tesla Wall Sys., LLC v. Related Cos., L.P.*, No. 17-cv-5966, 2017 WL 6507110, at *6 (S.D.N.Y. Dec. 18, 2017).

In addition, where a plaintiff pleads ongoing tort, the statute of limitations defense may still be raised on a 12(b)(6) pre-answer motion.  *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 462 (S.D.N.Y. 2020), *appeal filed*, No. 20-546 (2d Cir. Feb. 12, 2020).

here.  After Medcenter lost Estefania and Aristu, a "top management key person [with] extensive and detailed confidential information about Medcenter's Directed Projects," ¶ 70, Medcenter waited more than three-and-a-half years to file suit, and even then, not against her.  The claims brought against defendants here are beyond the applicable limitations periods for trade secrets.

"DTSA claims are subject to a three-year statute of limitations.  *See* 18 U.S.C. § 1836(d). The limitations period runs from 'the date on which the misappropriation . . . is discovered or by the exercise of reasonable diligence should have been discovered,' or, in other words, when the plaintiff 'knew or should have known that the alleged trade secrets were wrongfully acquired, disclosed, or used.'" *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 459, 461 (S.D.N.Y. 2020) (dismissing trade secret misappropriation claims on statute of limitations grounds), *appeal filed*, No. 20-546 (2d Cir. Feb. 12, 2020).

New York likewise has a three-year limitations period for trade secret claims and "New York law governing the accrual of statutes of limitations is less permissive for plaintiffs than the law under the DTSA . . . . Statutes of limitations accrue for misappropriation claims when the defendant first discloses the trade secret or when the defendant first makes use of the plaintiff's ideas." *Id.* at 461.  In New York, a cause of action accrues "when a reasonably diligent person in plaintiff's position would have been put on inquiry as to the claim." *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 50 (2d Cir. 2019) (citation omitted) (affirming dismissal of trade secret claim where plaintiff had been on inquiry notice for three years and two months).

## A.    <u>Aristu's Departure On June 6, 2019 Put Plaintiffs On Inquiry Notice</u>

Any company acting with reasonable diligence would have begun an inquiry no later than June 6, 2019, the day on which Aristu joined Global, especially since plaintiffs claim they knew that defendants wanted to expand into Latin America.  Not only had Global retained Aristu and Estefania, but plaintiffs claim that defendants had made prior overtures to another Medcenter

executive, Carol Calva. ¶ 108-109.  And, plaintiffs knew that Sanmarco had given Aristu access

to the Salesforce Database in the month preceding her departure.  ¶¶ 128-131, 151.  "Inquiry notice

imposes an obligation of reasonable diligence."  *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353,

362 (2d Cir. 2013).  With this background, a prudent business would have acted to protect itself

after Aristu left.  Had plaintiffs performed a rudimentary investigation, they would have found the

same thing they discovered later: over the years while working for Medcenter, Aristu allegedly

had others occasionally run reports from the Salesforce and Physicians Databases. ¶¶ 71, 174.[8]

**B.**      **Aristu's June And September Letters Put Plaintiffs On Actual Notice**

Aristu's correspondence with Medcenter in June and September 2016 put plaintiffs on

express notice of a brewing dispute over the trade secrets at issue here.  Notice for statute of

limitations purposes does not require actual *knowledge*:

> One who has reasonable grounds for suspecting or inquiring ought to suspect, ought
> to inquire, and the law charges him with the knowledge which the proper inquiry
> would disclose. . . . ***Actual knowledge is not required.  Actual notice embraces all
> degrees and grades of evidence, from the most direct and positive proof to the
> slightest circumstances from which a jury would have been warranted in
> inferring notice***. . . . Knowledge of facts, which, to the mind of a man of ordinary
> prudence, beget inquiry, is actual notice, or, in other words, is the knowledge which
> a reasonable investigation would have revealed.

*Cockshaw v. Guar. Tr. Co. of N.Y.*, 282 A.D. 688, 689 (1st Dep't 1953) (Dore, J., concurring in

affirmance of dismissal on statute of limitations grounds) (emphasis added) (citation omitted).

Plaintiffs' correspondence with Aristu is proof of *actual notice* of trade secrets claims.  On

June 14, 2016, obviously in response to Medcenter's accusation of wrongdoing, Aristu wrote to

plaintiffs and "denied being disloyal or acting in bad faith toward Medcenter, denied causing any

damage or committing unfair competition."  ¶ 156.  Unfair competition is "grounded in either

---

[8]       Aristu has advised defendants that she never had access to the Physician's Database.

deception or appropriation of the exclusive property of the plaintiff." *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 446 (E.D.N.Y. 2011) (citation omitted) (internal quotation mark omitted). As this Court has observed, "[a]n unfair competition claim rises and falls with a claim of misappropriation of trade secrets." *Accurate Grading*, 2013 WL 1234836, at *9. By denying engaging in "unfair competition," Aristu put plaintiffs on actual notice of a dispute about the alleged misappropriation of secrets.

By September 14, 2016, the contours of the instant dispute came further into focus. On September 6, 2016 plaintiffs, in their own words, "put Aristu on notice of potential claims against her" including claims that Aristu disclosed confidential information to defendants. ¶¶ 158-159. Aristu's response asserted that her "'commercial know-how' belonged to her." ¶ 160. In that response, without any ambiguity, Aristu told Medcenter that she was entitled to use a portion of what plaintiffs allege are their trade secrets. That is actual notice.

Plaintiffs cannot defend by saying their claims focus on the databases, not Aristu's know-how. Plaintiffs allege that Aristu's "know how," combined with its databases, collectively constituted their "core bundle of trade secrets." ¶ 169. Aristu's claim to own her know-how gave plaintiffs *actual knowledge* (not just notice) of this dispute.[9] *Barksdale v. Robinson*, 211 F.R.D. 240, 244 (S.D.N.Y. 2002) (dismissing infringement claim where plaintiff's cease-and-desist letter demonstrated actual knowledge). As in *Barksdale*, Medcenter's threat to sue demonstrates actual notice. Aristu's response simply removes any lingering metaphysical doubt.

---

[9]     Plaintiffs were also aware of their alleged damages outside the limitations period. They concede that "[s]tarting in late 2016, as the Directed Projects business continued to decline, Medcenter began to inquire internally about whether Aristu might have taken with her any of the company's confidential information without authorization." ¶ 164. Yet despite having already threatened her, Medcenter took no legal action until 2020.

Plaintiffs cannot excuse their delay by claiming they lacked certainty or were not sure of damages. That argument leads to the absurd conclusion that until a plaintiff has first-person knowledge of each element of a claim, the limitations period never begins.  In a California case with a strikingly similar fact pattern, the District Court dismissed that line of thinking:

> This argument, which at a superficial level seems logical enough, proceeds from a premise that is fundamentally wrong. That premise is that a "cause of action" cannot 'accrue' for statute of limitations purposes unless and until it is clear that a plaintiff has, as a matter of historical fact, a winning claim, i.e., until a plaintiff is in a position to present evidence which will (regardless of what evidence the defense musters) establish facts which make liability a legal certainty. This simply is not the law.

> Nor could this be the law without defeating some of the most important purposes of statute of limitations doctrine and turning litigation relationships upside down. . . . [I]f we were to accept [plaintiffs'] argument, "there would be no statute of limitations for specious or unsupportable claims, only for claims which are ultimately proved to have merit."  Moreover, under plaintiff's theory, a defendant could successfully invoke the statute of limitations only by proving, in trial, that at an earlier time, outside the limitations period, plaintiff would have established liability if it had litigated the matter to judgment.

*Inermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 641 (N.D. Cal. 1993) (citations omitted). Plaintiffs here were on actual notice of their trade secret claims more than three years before this case was filed.  Those claims are therefore untimely.

## C.    Continuing Wrong Doctrine Does Not Apply

Plaintiffs may not extend the limitations period under the doctrine of continuing tort.  First, plaintiffs plead *no facts* to support such a theory.  Instead, they allege the bare legal conclusion that "[u]pon information and belief, the WebMD Defendants' use . . . continued throughout 2017 and into subsequent years, and such trade secrets continue to have ongoing value to the WebMD Defendants."  ¶ 186. Plaintiffs do not say that the Physicians Database was repeatedly used for marketing or that the Salesforce Database was used to poach clients.  They merely mouth the words "continuing" and "ongoing" as an incantation, without any facts.  A "pleading that offers only

'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Optionality Consulting*, 2019 WL 4523469, at *4 (quoting *Twombly*, 550 U.S. at 555).

Second, the continuing wrong doctrine is inapplicable where plaintiffs have actual knowledge of their claims.[10]  It is black letter law that "[w]here . . . the plaintiff had knowledge of the defendant's misappropriation and use of its trade secret, the continuing tort doctrine does not apply." *Universal Instruments*, 924 F.3d at 50 (citations and interior quotations omitted); *see also M&T Chems., Inc. v. Int'l Bus. Machs. Corp.*, 403 F. Supp. 1145, 1149-50 (S.D.N.Y. 1975), *aff'd*, 542 F.2d 1165 (2d Cir. 1976).  To be clear, among other things, all before the end of 2016, plaintiffs began an inquiry into the possible misappropriation of trade secrets, they lost business, and Aristu responded to threats by stating her know-how was not plaintiffs' proprietary information.  Plaintiffs had actual knowledge in 2016.

## III.  NEITHER NEW YORK LAW NOR THE DTSA APPLY TO THE TRADE SECRET CLAIMS

All of the operative events here occurred in Argentina, except for one alleged meeting in Miami.  New York common law does not stretch extraterritorially to capture this conduct.  Nor does the DTSA.  The extraterritorial provisions of the Economic Espionage Act (into which the DTSA is embedded) apply only to its criminal prohibitions, not to civil misappropriation.

### A.  New York Common Law Does Not Reach The Trade Secrets At Issue

"Since . . . prohibitions on trade secret misappropriation are conduct-regulating rules, the locus of the tort determines which law should apply." *TransPerfect Glob., Inc. v. Lionbridge*

---

[10]  There is a continuing tort doctrine under both the DTSA and New York common law.  *See* 18 U.S.C. § 1836(d); *Andrew Greenberg, Inc. v. Svane, Inc.*, 36 A.D.3d 1094, 1098-99 (3d Dep't 2007).  However, that doctrine is inapplicable here, where plaintiffs admit notice of a claim outside the limitations period.  A party cannot sit on its rights and rely on the continuing tort doctrine to avoid statute of limitations dismissal.  *Universal Instruments*, 924 F.3d at 50.

*Techs., Inc.*, No. 19-cv-3283, 2020 WL 1322872, at *8 (S.D.N.Y. Mar. 20, 2020).  Not a single allegation in the FAC ties a tort to New York.  Instead, the alleged misappropriation occurred in Argentina, where Aristu resides and has always worked.  If any law applies, it should be that of Argentina.  *Softel, Inc. v. Dragon Med. & Sci. Comm'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (applying New York law to trade secret misappropriation claims because "the misappropriation, if any, apparently took place in New York").

Where, as here, New York law does not regulate the conduct at issue, a claim predicated on New York law must be dismissed.  *Glob. Reinsurance Corp.-U.S. Branch v. Equitas Ltd.*, 18 N.Y.3d 722, 735 (2012) (dismissing Donnelly Act claim where relevant conduct took place in London) ("The established presumption is, of course, against the extraterritorial operation of New York law . . . .").

Plaintiffs cannot argue that New York law is an adequate substitute for Argentina law or that defendants must demonstrate a conflict.  Because Argentina is a civil law country, there is no presumption that its law is similar.  *Sonnesen v. Pan. Transp. Co.*, 298 N.Y. 262, 267 (1948) ("We are not entitled to assume that the maritime law of Panama (a 'civil law' country) is the same as ours, or as any part of ours.").  It is not defendants' burden to prove differences between the common law and the civil law of Argentina.  As Justice Holmes wrote when reversing a trial court that had erroneously placed the burden on a defendant to prove Cuban law:

> Generally speaking, as between two common-law countries, the common law of one reasonably may be presumed to be what it is decided to be in the other . . . . But a statute of one would not be presumed to correspond to a statute in the other, and when we leave common-law territory for . . . a different system . . . the limits must be narrower still.

*Cuba R.R. Co. v. Crosby*, 222 U.S. 473, 479 (1912).

Here, too, the burden is not on defendants to prove that Argentina law is different. There is no presumption that civil law mirrors common law regarding protection of trade secrets. Indeed, treatises on Argentine law show the two systems differ dramatically:

> Tort rules: ***there are no specific tort rules applicable to trade secrets or confidential information under Argentine law***. However, the Civil and Commercial Code includes broad provisions that apply in principle to all types of illegal conduct that causes damage to another person or to his or her property and that could, therefore, be considered applicable to the damages caused by an illegal use or disclosure of trade secrets. Nevertheless, in the absence of definite statutory provisions defining illegal conduct in relation to trade secrets and of sufficient case law applying the broad tort law provisions of the Civil and Commercial Code, it is not possible to derive clear conclusions about the precise applicability of such provisions in this area. The rights held by a trade secret possessor must be derived from other rules, such as labour law rules, and tort law becomes applicable only once such rights are violated.

Guillermo Cabanellas, *Intellectual Property Law in Argentina* § 272(e) (4th ed. 2018) (emphasis added). The New York common law claim must be dismissed.

## B.      The DTSA Has No Extraterritorial Force Or Effect

The DTSA claims must be dismissed for similar reasons. The extraterritorial provisions of the Economic Espionage Act of 1996 (the "EEA"), 18 U.S.C. §§ 1831-1839, into which the DTSA was embedded, apply only to the criminal "offenses" defined in the EEA, "economic espionage" and "theft of trade secrets." The provision in the EEA permitting extraterritorial enforcement does not apply to the civil tort of "misappropriation."

Under Supreme Court precedent, the presumption against extraterritoriality can only be rebutted by "a clear, affirmative indication that [the statute] applies extraterritorially." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). The EEA makes a clear carve-out for extraterritorial application, but the carve-out is only applicable "if-- (1) the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States . . . or (2) an act in furtherance of the offense was

committed in the United States."  18 U.S.C. § 1837.  By its terms, the extraterritorial provision of the EEA only applies to "offenses" and "offenders."  But offenses are criminal in nature.  Black's Law Dictionary defines "offense" as a "violation of the law; a crime, often a minor one. — Also termed *criminal offense*."  *Offense*, Black's Law Dictionary (11th ed. 2019).

The EEA contains three prohibitions: it defines the two crimes of "Economic espionage," 18 U.S.C. § 1831, and "Theft of trade secrets," 18 U.S.C. § 1832, and it also defines the tort of "misappropriation," 18 U.S.C. § 1836, providing a private right of action for civil plaintiffs to seek redress.  But misappropriation is not a criminal "offense."  It is merely a civil tort.

The clear distinction between the civil and criminal portions of the EEA mean that the extraterritoriality provisions of 18 U.S.C. § 1837, which reach only "offenses," do not apply to civil misappropriation claims.  *See Phx. Ancient Art, S.A. v. J. Paul Getty Tr.*, No. 17-cv-241, 2018 WL 1605985, at *9 (S.D.N.Y. Mar. 29, 2018) (Civil claims based on concealment of trade secrets dismissed because "concealment only violates the DTSA's *criminal* provision, 18 U.S.C. § 1832, and plaintiffs have not cited any authority suggesting that the provision authorizes private causes of action.  Indeed, courts outside this Circuit have held that private citizens do not have the right to enforce the DTSA's criminal provision." (citing *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835, 842-43 (E.D. Va. 2017); *Nelson Bros. Professional Real Estate LLC v. Jaussi*, No. 17-cv-0158, 2017 WL 8220703, at *6 (C.D. Cal. Mar. 23, 2017))).

Civil misappropriation is distinct from economic espionage and theft of trade secrets. While the definition of "theft of trade secrets" and "misappropriation" bear surface similarities, they are substantively different.

- Theft of trade secrets: "[w]hoever, with intent to convert a trade secret . . . and intending or knowing that the offense, will injure any owner of that trade secret, knowingly . . . receives, buys, or possesses such information, knowing the same to

have been stolen or appropriated, obtained, or converted without authorization." 18 U.S.C. § 1832(a)(3).

- Misappropriation: "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means, or (B) disclosure or use of a trade secret of another without express or implied consent . . . ." 18 U.S.C. § 1839(5).

Theft of trade secrets requires intent to injure or knowledge thereof; misappropriation requires only that a person "have reason to know."

Here, plaintiffs ask the Court to extend the Court's civil jurisdiction to conduct that occurred in Argentina and whose effects were allegedly only felt in Argentina and elsewhere in Latin America. While under the right circumstances, the EEA might afford a court criminal jurisdiction to sanction a defendant for such conduct, it does not extend a court's civil jurisdiction in the same manner. The extraterritoriality carve-out of the EEA does not apply to "misappropriation."

Even if the Court had extraterritorial jurisdiction, the allegations are insufficient to trigger the DTSA's jurisdictional hook. Under the DTSA, the court has jurisdiction if "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). But plaintiffs do not allege how the material in the Physicians Database or the Salesforce Database is "related to a . . . service used in, or intended for use in . . . foreign commerce." The Court lacks jurisdiction to adjudicate the DTSA claims.

## IV.    PLAINTIFFS' CONTRACT CLAIM FAILS TO ALLEGE BREACH OR DAMAGES

Plaintiffs claim that WebMD Health must have violated the NDA by disclosing the identity of Aristu and Estefania to Global and Medcenter. However, Aristu's and Estefania's profiles were publicly available on LinkedIn, and previously known to defendants anyway through the parties'

six-year collaboration.  The information was therefore not confidential.  Plaintiffs also fail to allege

any damages associated with that disclosure.  Either of these deficiencies dooms the contract claim.

A breach of contract claim under New York law requires a plaintiff to show "(1) the

existence of an agreement,[11] (2) adequate performance of the contract by the plaintiff, (3) breach

of contract by the defendant, and (4) damages."  *Ellington Credit Fund, Ltd. v. Select Portfolio

Servicing, Inc.*, 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011).

## A.    <u>Plaintiffs Do Not Allege Any Breach Of The NDA</u>

Where information is "generally known prior to any alleged disclosures . . . the NDA was

not breached."  *Convolve, Inc. v. Compaq Computer Corp.*, No. 00-cv-5141, 2011 WL 7144803,

at *26 (S.D.N.Y. Oct. 6, 2011), *aff'd in part and rev'd in part*, 527 F. App'x 910 (Fed. Cir. 2013)

(affirming on breach of NDA).  The definition of Confidential Information in the NDA expressly

excludes that which "is or becomes generally available to the public," such as through LinkedIn

profiles.  It likewise excludes information that "was available to the receiving party hereunder on

a non-confidential basis prior to its disclosure by the disclosing party."  The Aristus' detail-rich

LinkedIn profiles, one with a glowing endorsement from CEO Sanmarco from Aug. 23, 2011,

made their professional experience and qualifications public knowledge.  *See* Mitchell Decl. Exs.

4, 5.  The six-year collaboration between the parties was also sufficient for defendants to become

intimately acquainted with Medcenter's Latin American team.  Thus, neither the identities nor job

descriptions for the Aristus were Confidential Information as defined in the NDA.  As in *Convolve*,

which concerned an NDA with similar wording, plaintiffs point to no information allegedly

---

[11]    Among the plaintiffs, only Medcenter Holdings has standing to allege breach, because only
it was a party to the NDA.  "A claimant that is not a party to a contract or an intended beneficiary
generally cannot enforce the obligations of that contract."  *Palomo v. DeMaio*, No. 15-cv-1536,
2017 WL 6001825, at *4 (N.D.N.Y. Dec. 4, 2017).

disclosed that was not publicly available and had not become known to defendants during the 6-year collaboration.  Disclosure or use of that information cannot have been breach.

**B.**     **Plaintiffs Allege No Damages Connected Solely To Breach Of The NDA**

"Without a clear demonstration of damages, there can be no claim for breach of contract." *Milan Music, Inc. v. Emmel Commc'ns Booking, Inc.*, 37 A.D.3d 206, 206 (1st Dep't 2007) (affirming dismissal where "alleged damages amount[ed] to nothing more than conjecture as to what could have been earned").  A complaint that fails to demonstrate how an alleged breach caused damage to the plaintiff is "fatally deficient."  *Gordon v. Dino De Laurentiis Corp.*, 141 A.D.2d 435, 436 (1st Dep't 1988); *see also Int'l Bus. Machs. Corp. v. Dale*, No. 11-cv-951, 2011 WL 4012399, at *4 (S.D.N.Y. Sept. 9, 2011).

As in *Milan* and *Gordon*, plaintiffs do not connect the disclosure of Aristu's or Estefania's identities with any damages.  Plaintiffs' loss of business was allegedly occasioned by the use of Medcenter's trade secrets, not by the hiring of Aristu or Estefania alone.  *Gordon*, in which the First Department affirmed dismissal of trade secret and breach of NDA claims, mirrors plaintiffs' claims:

> Plaintiffs have not identified any confidential information imparted to defendant other than the specifics of their prior proposal to Coca-Cola and the financial due diligence with respect to Embassy. ***This information cannot be classified as confidential or secret since it was already in Coca-Cola's possession before plaintiffs disclosed it to defendant***. Moreover, the complaint is fatally deficient because it ***does not demonstrate how the defendant's alleged breach of the confidentiality agreement caused plaintiffs any injury***. The complaint contains only boilerplate allegations of damage. In the absence of any allegations of fact showing damage, ***mere allegations of breach of contract are not sufficient to sustain a complaint, and the pleadings must set forth facts showing the damage upon which the action is based***.

141 A.D.2d at 436 (emphasis added).  In the instant case, the mere hiring of Aristu and Estefania did not cause any actionable harm.  Indeed, it was not forbidden by the NDA. The only damages

identified in the FAC are related to the alleged loss of Directed Projects.  Disclosure of the Aristus'

identities is not connected to that injury.

## V.      **THE TRADE SECRET CLAIMS DO NOT STATE A CLAIM FOR RELIEF**

To establish misappropriation under the DTSA, an owner of a trade secret[12] must show:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B)  disclosure or use of a trade secret of another without express or implied consent by one who--

(i) used improper means to acquire knowledge of the secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret . . . ; or

(III) derived from or through a person who owed a duty . . . .

18 U.S.C. § 1839(5).  The DTSA thus "contemplates three theories of liability: (1) acquisition,

(2) disclosure, or (3) use."  *AUA Private Equity Partners, LLC v. Soto*, No. 17-cv-8035,

2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018).  Plaintiffs do not plead a disclosure theory.

And instead of pleading facts to support an acquisition or use theory, plaintiffs invite the Court to

speculate on the basis of plaintiffs' loss of business.  Such speculation is insufficient.

---

[12]      The DTSA defines "owner" as "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed."  18 U.S.C. § 1839(4).  Plaintiffs nowhere allege which plaintiff entity owns the Physicians Database or the Salesforce Database, if any of them, or whether another, unnamed member of the Medcenter family is the owner.  In fact, plaintiffs do not allege ownership of the databases at all.  Plaintiffs have therefore not sufficiently alleged standing under the DTSA or under common law.

Plaintiffs' vague allegations, based solely on speculation about what "must have happened" mirror those of the plaintiffs in *Exceed Holdings LLC v. Chicago Board Options Exchange Inc.*, No. 17-cv-8078, 2018 WL 4757961, at *5 (S.D.N.Y. Sept. 30, 2018), in which Judge Abrams dismissed both breach of NDA and trade secret misappropriation claims because the complaint's allegations were based solely in speculation about what "must have happened":

> Exceed's claim fails because it has not plausibly alleged that CBOE disclosed any proprietary information . . . . Exceed has no direct allegations of any such disclosure by CBOE. ***It instead relies on the assumption that VEST could not have launched its products without receiving Exceed's proprietary information***. ***Exceed's allegations, however, are insufficient to "nudge [its] claims across the line from conceivable to plausible*****.**" . . . In particular, other than identifying the information Exceed shared with CBOE pursuant to the NDA, ***it does not identify what proprietary information was used by VEST and precisely*** <u>***how***</u> ***the VEST products were similar to Exceed's***.

*Id.* at *5 (alteration in original) (emphasis added) (quoting *Twombly*, 550 U.S. at 570).

Medcenter's pleading suffers the same shortcomings as *Exceed*'s: instead of pleading facts illustrating misappropriation, plaintiffs speculate that defendants could not have broken into the Latin American market without plaintiffs' trade secrets. But, as in *Exceed*, the facts are missing. Plaintiffs fail to state whether defendants' Directed Projects are in any way similar to Medcenter's and how. They fail to elaborate whether, and if so how, defendants came into possession of Medcenter's trade secrets, let alone used them. Plaintiffs never explain whether Aristu, an independent contractor, passed anything to defendants, be it on hard drives or paper copies. They do not state whether defendants targeted the doctors in the Physicians Database or whether they used the information in the Salesforce Database to underbid Medcenter.[13] Without facts, plaintiffs' "conclusory[,] . . . everything-but-the-kitchen-sink assertions that Defendants have made

---

[13]   Indeed, plaintiffs actively disregard Aristu's representation in her Global contract that none of the deliverables would "infringe, misappropriate or violate the intellectual property rights or privacy rights o[f] any third party." Mitchell Decl. Ex. 3 ¶ 6(b) (Aristu Contract).

improper and unauthorized use of [plaintiff's] Customer List, Supplier List, and Confidential Business Information' to solicit customers are insufficient to state a claim." *Veronica Foods Co. v. Ecklin*, No. 16-cv-07223, 2017 WL 2806706, at *14 (N.D. Cal. June 29, 2017).

The New York common law trade secrets claims must be dismissed for similar reasons. "The elements for stating a claim of misappropriation of trade secrets under New York law 'are fundamentally the same' as those sustaining a claim under the DTSA." *Kraus USA, Inc. v. Magarik*, No. 17-cv-6541, 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020) (citation omitted). Under New York law, "[a] plaintiff claiming misappropriation of a trade secret must prove that (1) 'it possessed a trade secret,' and (2) the trade secret was used by defendant 'in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.'" *Universal Instruments*, 924 F.3d at 49 (citation omitted); *accord E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 452 (2018).  The pleading deficiencies that doom plaintiffs' DTSA allegations apply equally here.  Absent factual allegations about defendants' use of the trade secrets, plaintiffs' New York claims do not move from conceivable to plausible and must be dismissed.

## CONCLUSION

For the reasons set forth above, defendants respectfully request that the Court dismiss each claim in the FAC with prejudice.

Dated: New York, New York
　　　 July 13, 2020

Respectfully submitted,

BROWNE GEORGE ROSS LLP

By:___ s/Jeffrey A. Mitchell_____
　　　Jeffrey A. Mitchell
　　　Stephen P. Farrelly
5 Penn Plaza, 24th Floor
New York, New York 10001
Telephone:  (212) 413-2600
Facsimile:  (212) 413-2629

1590097

25

jmitchell@bgrfirm.com
sfarrelly@bgrfirm.com
*Attorneys for Defendants*