| | |
|---|---|
| **UNITED STATES DISTRICT COURT**<br>**SOUTHERN DISTRICT OF NEW YORK** | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC#: _____<br>DATE FILED:  3/29/2021 |

**MEDCENTER HOLDINGS INC., MEDCENTER SOLUTIONS SA, MED SOLUTIONS MÉXICO, S. DE R.L. DE C.V. and MEDCENTER SOLUTIONS DO BRASIL SA,**

                                    **Plaintiffs,**

     -against-

**WEBMD HEALTH CORP., MEDSCAPE, LLC, and WEBMD GLOBAL LLC,**

                                    **Defendants.**

**1:20-cv-00053 (ALC)**

**OPINION & ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

       The Court now considers a motion by Defendants WebMD Health Corp., Medscape, LLC and WebMD Global LLC (collectively the "WebMD Defendants"[1]) to dismiss the First Amended Complaint of Plaintiffs Medcenter Holdings Inc., Medcenter Solutions SA ("Medcenter Argentina"), Med Solutions México, S. de R.L. de C.V. ("Medcenter Mexico"), and Medcenter Solutions do Brasil SA ("Medcenter Brazil") (collectively "Medcenter"[2]) pursuant to Rule

---

[1] The First Amended Complaint alleges that WebMD Health Corp. is a Delaware corporation that is authorized to do business in the state of New York and has its nerve center and principal place of business in the state and county of New York, with an address at 395 Hudson Street, New York, New York 10014; Medscape is a Delaware limited liability company that is authorized to do business in the state of New York and has its nerve center and principal place of business in the state and county of New York, with an address at 825 Eighth Avenue, 11th Floor, New York, New York 10019; and WebMD Global is a Delaware limited liability company that is authorized to do business in the state of New York and has its nerve center and principal place of business in the state and county of New York, with an address at 111 8th Ave., New York, New York 10011. It further alleges Defendant WebMD Health Corp controls the remaining WebMD Defendants.

[2] Plaintiff Medcenter Holdings is a Cayman Islands corporation formed in 2002, with its nerve center and principal place of business in Monaco. Medcenter Holdings directly or indirectly controls Medcenter Argentina, Medcenter Mexico and Medcenter Brazil. The national Medcenter entities are organized under the laws of the corresponding country and have principle places of business there. Medcenter Mexico holds the controlling shareholder interest in Medcenter Argentina. Medcenter Holdings holds the controlling shareholder interest in Medcenter Brazil and Medcenter Mexico.

1

12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is DENIED.

Background

This matter arises from the alleged misappropriation of Medcenter's trade secrets by the WebMD Defendants, which Medcenter alleges led to the demise of its business. As of mid-2016, the primary driver of Medcenter's revenue was engagements by pharmaceutical companies to create and execute drug and medical product marketing programs that targeted specific physicians by practice specialty throughout Latin America. To design these programs, referred to as "Directed Projects", Medcenter leveraged two proprietary databases.

One was their Physician Database, which had been built out over many years and contained detailed information regarding doctors all over Latin America, including their contact information, specializations, and more. This information was derived from Medcenter's long-term relationships with physicians and medical organizations throughout Latin America, as well as data collected directly from physicians via Medcenter's online portal.

The other was Medcenter's Salesforce Customer Relationship Management Database. "All material data about each Medcenter Pharma Client, confidential contract terms, contract negotiation status, key pharmaceutical executive/management contacts having project content input or contract approval authority, Medcenter's senior sales representatives having assigned responsibilities for promoting Directed Projects, and other relevant information concerning Medcenter's Directed Projects, were maintained [there] with very restricted access". FAC ¶ 58.

The WebMD Defendants were engaged in a similar line of business to Medcenter in other parts of the world but had no foothold in Latin America. Medcenter and Medscape entered into a

September 1, 2007 Collaboration Agreement to cross-use professional content targeting physicians and do Directed Programs together and share revenue. The Collaboration agreement ended in December 2013 with limited success.

As of Spring 2014, discussions began between WebMD Health Corp. and Medcenter concerning a potential acquisition of Medcenter's Latin American subsidiaries by WebMD Health Corp. These discussions were had, and accompanying diligence was done, pursuant to a detailed, mutual, Non-Disclosure Agreement dated March 3, 2014 (the "NDA"). Pursuant to the NDA:

> Confidential Information of the disclosing party hereunder shall include all information about the disclosing party's businesses, operations, finances, properties, employees, relationships with third parties, plans, trade secrets, other intellectual property and 'know-how' and all other information, documents and materials that are delivered or otherwise disclosed by one party to the other, whether oral, written, visual or in some other form, and whether or not identified as confidential.

ECF No. 18-1 at 1. Confidential Information does not include:

> [I]nformation which (a) is or becomes generally available to the public, other than as a result of a disclosure by the receiving party hereunder or its Representatives (as defined below), (b) was available to the receiving party hereunder on a nonconfidential basis prior to its disclosure by the disclosing party, provided that the source of such Information was not known by the receiving party to be bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to the disclosing party hereunder, (c) is or becomes available to the receiving party on a non-confidential basis from a source other than the disclosing party, provided that such source was not bound by a confidentiality obligation to the disclosing party, or (d) is or was independently developed by the receiving party without use of or reference to the Confidential Information.

*Id.*

As part of this diligence process, WebMD Health Corp was shown the structure of the proprietary databases but was not permitted to see the actual data. Representatives of WebMD Health Corp. were given access to, and allowed to interview, Medcenter's senior employees,

3

officers and country managers with Medcenter Argentina, Medcenter Brazil and Medcenter Mexico, and were also permitted to see Medcenter's confidential employment terms of its key employees and officers, including Mariel Aristu, Medcenter Argentina's Director and Vice President of Sales and Key Accounts. The discussions about a possible purchase terminated in or about early June 2015. Though Medcenter and WebMD Health Corp. settled on an all cash offer of $20 million, WedMD Health Corp's board did not approve the acquisition. Medcenter was told the decision was based on purported economic risks associated with the Latin American region. However, WebMD Global indicated an interest in acquiring Medcenter's assets as late as May 2016.

In mid-May 2016, Aristu attended a conference in Miami where the CEO of WebMD Health Corp, Jeremy Schneider, was scheduled to give a presentation. Under the guise of needing to work while on that trip, Aristu requested and was given the Salesforce Database access "key". A few days later, on June 6, 2019, Aristu resigned from Medcenter abruptly and without notice. Shortly thereafter Aristu's LinkedIn profile was updated to show that she worked at a WebMD entity.

After Aristu's departure, Medcenter experienced a slowdown in Directed Projects, which eventually led them to consider whether Aristu had stolen proprietary information when she departed. On or about January 11, 2017, Medcenter for the first time saw that Medscape's website was publicizing pharmaceutical marketing programs in Latin America including projects for which Aristu had been responsible prior to her departure from Medcenter.

By an investigation that culminated in October 2017, "Medcenter [] learned that Aristu used her access privileges and the Salesforce Database 'key' to access, download, retain and steal substantial amounts of confidential Medcenter data on all ongoing Directed Projects that were in

4

process as of June 2016, including detailed information on every Pharma Client with which Medcenter had a relationship and how that relationship operated. At the same time, she intentionally delayed the progress of those Directed Projects until she left Medcenter, in part by sending deceptive emails to Sanmarco in May and early June 2016 about anticipated deal closings of Directed Projects." FAC ¶ 133. "Medcenter also learned that during the approximate one month period (mid-May to mid-June 2016) when Aristu was given administrative rights to the Salesforce Database, she obtained from other Medcenter employees photographs of various Pharma Client key contact persons, which she then added to the reports he created to be able to identify these key persons whom she had never met." FAC ¶ 135. Aristu also requested information from the Physicians database gradually, thereby amassing data on entire Latin American countries while not arousing suspicion.

Altogether, Medcenter contends that the WebMD Defendants improperly used the Confidential Information acquired pursuant to the NDA regarding Medcenter's personnel to target Aristu (and others) for poaching, and conspired with her to steal Medcenter's trade secrets, the Physicians and Salesforce databases, and ultimately Medcenter's business.

Medcenter initiated the instant lawsuit on January 3, 2020 and filed the operative First Amended Complaint on June 5, 2020. Medcenter claims: misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq. (Count I), misappropriation of trade secrets under New York common law (Count II); and breach of contract by WedMD Health Corp. (Count III). For relief Medcenter seeks (1) an order requiring the WebMD Defendants to provide an accounting of all revenues and profits derived directly or indirectly from their misappropriation of Medcenter's trade secrets and confidential information; (2) a permanent injunction prohibiting the WebMD Defendants from continuing to use or disclose Medcenter's trade secrets; (3) an order

5

requiring the WebMD Defendants to account for and return all Medcenter trade secrets in their possession, custody or control, and to certify that they have done so; (4) a permanent injunction prohibiting the WebMD Defendants from continuing to use or disclose for any purpose Medcenter's trade secrets; (5) an award of compensatory, consequential, and exemplary damages under the DTSA, including 18 U.S.C. §1836(b)(3)(B); (6) an award of compensatory, consequential, and punitive damages for intentional misappropriation of Plaintiffs' trade secrets and confidential information under New York common law; (7) an award of damages against WebMD Health Corp. for material breaches of the NDA; (8) prejudgment interest; and (9) attorneys' fees pursuant to U.S.C. 19 U.S.C. §1836(b)(3)(B) and costs.

Defendants moved to dismiss the First Amended Complaint on July 13, 2020. Plaintiffs opposed the motion on August 21, 2020. Defendants replied on September 9, 2020.

Standard of Review

When considering a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). The court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at

570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id*. at 663.

## Discussion

Defendants move to dismiss under Rule 12(b)(6) arguing that Plaintiffs' trade secret claims are untimely; that neither the DTSA nor New York common law apply here because the misappropriation occurred in Argentina; that the trade secret claims do not state a claim for relief; and that the contract claim fails to allege a breach or damages. For the reasons that follow, the motion is DENIED.

*1. Defense of Trade Secrets Act and New York Misappropriation Claims*

Enacted in 2016, the Defense of Trade Secrets Act provides a federal cause of action for trade secret misappropriation. *See* Defend Trade Secrets Act of 2016, ch. 90, 130 Stat. 376 (2016) (codified as amended at 18 U.S.C. § 1831 *et seq.*). It defines a trade secret to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically" but only if (A) "the owner thereof has taken reasonable measures to keep such information secret;" and (B) "the information derives independent economic value. . . from not being generally known . . . [or] readily ascertainable . . . [to] another person who can obtain economic value from the disclosure or use of the information[.]" 18 U.S.C. § 1839(3)(A)-(B).

Under the DTSA, Misappropriation is defined as:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(B) disclosure or use of a trade secret of another without express or implied consent by a person who—
(i) used improper means to acquire knowledge of the trade secret;
(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
(I) derived from or through a person who had used improper means to acquire the trade secret;
(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
(iii) before a material change of the position of the person, knew or had reason to know that—
(I) the trade secret was a trade secret; and
(II) knowledge of the trade secret had been acquired by accident or mistake;

18 USCS § 1839(5).

"A plaintiff claiming misappropriation of a trade secret [under New York law] must prove: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. A trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [one] an opportunity to obtain an advantage over competitors who do not know or use it'". *E.J. Brooks Co. v. Cambridge Sec. Seals*, 80 N.Y.S.3d 162, 171 (May 3, 2019) (citations omitted).

   a. *Timeliness of the DTSA and New York Misappropriation Claims*

DTSA claims are subject to a three-year statute of limitations and accrue from the date the misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). Under New York law, trade-secret-misappropriation claims are also subject to a three-year statute of limitations. *See Andrew Greenberg, Inc. v. Svane, Inc.*, 36

A.D.3d 1094, 830 N.Y.S.2d 358, 362 (2007). "[W]hen a trade secret misappropriation claim accrues depends on what the party alleged to have committed the misappropriation did with the information. If a party misappropriates and publicly discloses a trade secret, the claim accrues upon disclosure. If, however, the party keeps the secret confidential yet makes use of it to his own commercial advantage, each successive use constitutes a new actionable tort for purposes of the statute of limitations." *CSFB HOLT L.L.C. v. Collins Stewart Ltd.*, 2004 U.S. Dist. LEXIS 15774, at *23-24 (S.D.N.Y. Aug. 10, 2004) (citing *Bausch & Lomb Inc. v. Alcon Laboratories, Inc.*, 64 F. Supp. 2d 233, 247 (W.D.N.Y. 1999)).

WebMD Defendants argue that Medcenter should have discovered the misappropriation as early as June 4, 2016, when Aristu quit and no later than September 2016, when a conflict over Aristu's departure arose. Plaintiffs counter that they did not have sufficient information to discover that Aristu had actually misappropriated Medcenter's proprietary databases until October 2017. The rule "in the statute of limitations context is that dismissal is appropriate only if a complaint clearly shows the claim is out of time." *Harris v. City of N.Y.*, 186 F.3d 243, 250 (2d Cir. 1999). "[T]he survival of a Rule 12(b)(6) motion to dismiss on statute of limitations grounds requires only allegations consistent with a claim that would not be time-barred." *Id.* at 251. While the benchmarks WebMD Defendants point to indicate that Medcenter was aware that Aristu had been poached, they do not clearly show that Medcenter should have known that Aristu took information from the proprietary databases at that time. Because the Court cannot conclude that the First Amended Complaint clearly shows Medcenter should have discovered the misappropriation by the exercise of reasonable diligence more than three years prior to the filing of the Complaint, the Court denies the motion to dismiss in this regard.

*b. Applicability of the DTSA and New York Misappropriation Law Extraterritorially*

WebMD Defendants argue that the DTSA does not apply extraterritorially for civil matters, and therefore is inapplicable here because the events largely occurred in Argentina. WedMD's main argument is that the use of "offense" in 18 USCS § 1837[3], as opposed to violation, indicates that the DTSA's extraterritorial application is limited to the criminal. Medcenter argues that the DTSA does indeed apply extraterritorially for civil matters like this one where an act in furtherance of the misappropriation was committed in the United States.

Several district courts around the country have considered this issue. The overwhelming weight of authority[4] indicates that the DTSA applies extraterritorially for both criminal and civil matters (1) "if the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or (2) an act in furtherance of the offense was committed in the United States." 18 USCS § 1837. The Court finds the well-reasoned decision in *Motorola Sols. v. Hytera Communs. Corp.*, out of the Northern District of Illinois, which rejects the WedMD Defendant's argument that the use of "offense" is dispositive, to be highly persuasive. Accordingly, the Court joins these district courts in concluding that the DTSA applies extraterritorially in criminal or civil matters under the aforementioned conditions.

---

[3] Section 1837 Applicability to conduct outside the United States: "This chapter [18 USCS §§ 1831 et seq.] also applies to conduct occurring outside the United States if—(1) the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or (2) an act in furtherance of the offense was committed in the United States."

[4] *See e.g.*, *Motorola Sols. v. Hytera Communs. Corp.*, 436 F. Supp. 3d 1150, 1159 (N.D. Ill. 2020); *Luminati Networks Ltd. v. BIScience Inc.*, No. 2:18-CV-00483-JRG, 2019 U.S. Dist. LEXIS 79843, 2019 WL 2084426, at *9-10 (E.D. Tex. May 13, 2019); *ProV Int'l Inc. v. Lucca*, No. 8:19-CV-978-T-23AAS, 2019 WL 5578880, at *3 (M.D. Fla. Oct. 29, 2019); *MACOM Tech. Sols. Inc. v. Litrinium, Inc.*, No. SACV19220JVSJDEX, 2019 WL 4282906, at *4 (C.D. Cal. June 3, 2019).

The question then becomes whether the pre-conditions for extraterritorial application of the DTSA are met in this case. Medcenter argues that acts in furtherance of the misappropriation were committed in the United States. These include the meeting between Aristu and Schneider in Miami, FL; the negotiation of the NDA in New York, which Medcenter contends was a Trojan Horse for WebMD Defendants to learn about Medcenter's employees and proprietary databases; and Aristu's consulting work with WebMD, which her contract indicates would take place partly in the United States. The Court concludes that these allegations sufficiently allege acts in furtherance of the misappropriation in the United States. The Court accordingly DENIES WebMD's motion as to this issue.

The Court now turns to the question of whether New York common law misappropriation reaches the conduct here. Defendants contend that "not a single act [related to the misappropriation] is alleged to have occurred in New York, so there is clearly no basis for Plaintiffs to invoke New York common law at all." Mot. ECF No. 28 at 4. The Court disagrees with the premise of this argument, which is that Medcenter only pleaded tortious conduct in Argentina. Rather, Medcenter sufficiently alleges that WebMD Defendants engaged in misappropriation from its nerve center in New York. The Court therefore declines to dismiss the New York claim on this basis at this stage of the case.

   *c. Failure to State a Claim for Misappropriation under the DTSA and New York Law*

WebMD Defendants argue that these claims must be dismissed because Medcenter does not plead facts that, if true, show WebMD Defendants acquired or used Medcenter's trade secrets and rely solely on speculation about what "must have happened". Mot. at 23-24. The Court disagrees. Medcenter sets forth detailed allegations about what proprietary materials were misappropriated (the Salesforce and Physician databases), how WebMD Defendants came to have

11

them (the theft by Aristu who was then hired by a WedMD Defendant), which led to Medcenter's loss of specific accounts previously handle by Aristu and the decline of its business. Contrary to WebMD's assertions, this is not mere "must have happened" reasoning like in *Exceed Holdings LLC v. Chi. Bd. Options Exch. Inc.*, where the court noted a "complete absence of factual allegations tending to show that [the defendant] disclosed any of [the plaintiff's] proprietary information". No. 17-CV-8078 (RA), 2018 U.S. Dist. LEXIS 169417, at *17 (S.D.N.Y. Sep. 30, 2018). The Court accordingly DENIES the motion to dismiss with respect to this argument.

*2.  Breach of Contract Claim*

"To prevail on a breach of contract claim under New York law, a plaintiff must prove '(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'" *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000) (citing *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998)).

WebMD Defendants seek dismissal of the breach of contract claim on the basis that the identity of the Medcenter employees it hired were not confidential and Medcenter alleges no damages. WedMD Defendants' argument mischaracterizes the alleged breach. The gravamen of Medcenter's breach allegation is not that the very identity of the employees was confidential. Rather, the claim seems to be that WebMD Health Corp used information acquired pursuant to the NDA about Medcenter's operations to target employees for poaching. Whether this is so, or these people were simply found on LinkedIn or through the course of WedMD Defendants and Medcenter collaborating, as WebMD Defendants contend, is a question of fact not to be resolved on this motion. Medcenter contends that this poaching contributed to the ultimate demise of Medcenter. The Court concludes this sufficiently states a breach and damage at this stage. Accordingly, the Court DENIES the motion to dismiss on this ground.

Conclusion

For the reasons stated above, WebMD Defendants' motion to dismiss is DENIED.

**SO ORDERED.**

**Dated: March 29, 2021**
      New York, New York

_____
      **ANDREW L. CARTER, JR.**
      **United States District Judge**

13