```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
MEDCENTER HOLDINGS INC.,                        :
MEDCENTER SOLUTIONS SA, MED                     :
SOLUTIONS MÉXICO, S. DE R.L. DE C.V.            :
AND MEDCENTER SOLUTIONS DO                      :      20-cv-00053 (ALC) (GWG)
BRASIL SA,                                      :
                                                :      ORDER & OPINION
                              Plaintiffs,       :
                                                :
          -against-                             :
                                                x
WEBMD HEALTH CORP., MEDSCAPE,
LLC, and WEBMD GLOBAL LLC,
                              Defendants.
-------------------------------------------------------------------
```

**ANDREW L. CARTER, JR., District Judge:**

Plaintiffs Medcenter Holdings Inc. ("Medcenter Holdings"), Medcenter Solutions SA ("Medcenter Argentina"), Med Solutions Mexico, S. de R.L. de C.V. ("Medcenter Mexico"), and Medcenter Solutions do Brasil SA, (collectively "Medcenter" or "Plaintiffs") bring this action against Defendants WebMD Health Corp. ("WebMD"), Medscape, LLC ("Medscape"), and WebMD Global LLC ("WebMD Global") (collectively "WebMD" or "Defendants") for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 et seq. and New York state common law; and against Defendant WebMD for breach of contract. ECF No. 18.

Plaintiffs allege that (i) WebMD Defendants' willfully and surreptitiously planned theft, misappropriation and use of Medcenter's trade secrets and confidential information, which comprised the heart of Medcenter's business throughout Latin America, resulting in the destruction of Medcenter's entire business; and (ii) WebMD Health Corp. breached a 2014 non-disclosure agreement ("NDA") entered into between Medcenter Holdings and Defendant WebMD Health Corp. in connection with WebMD Health Corp. conducting extensive due

1

diligence for its potential acquisition of Medcenter's entire Latin American business that enabled the WebMD Defendants to selectively identify and poach some of the most important senior management employees and officers of Medcenter as part of the WebMD Defendants' collective scheme to steal Medcenter's entire Latin American business. *Id*. at ¶ 1. Plaintiffs further allege that in or about the spring of 2016, the Defendants orchestrated a scheme to steal Medcenter's core trade secrets after the Defendants enlisted, in secret, the active participation of Medcenter Argentina's Director and Vice President of Sales and Key Accounts, Mariel Aristu. *Id*. at ¶ 3.

Defendants submitted a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 seeking to dismiss the First Amended Complaint ("FAC"). ECF No. 132. Plaintiffs oppose this motion. ECF No. 147. For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED in part and DENIED in part.**

## STATEMENT OF FACTS

The Court assumes the Parties' familiarity with the facts, which are set forth more fully in the FAC. ECF No. 18. Plaintiff Medcenter became the dominant provider of medical and pharmaceutical drug information, professional accreditation and continuing education to physicians in Central and South America. *Id*. at ¶ 28. To support its business, Medcenter developed and maintained two extensive databases – the "Physicians Database" and the "Salesforce Database." *Id*. at ¶¶ 31-48. Medcenter had developed the "Physicians Database" – a large, highly detailed proprietary database of physicians throughout Latin America, including dentists and their areas of practice and specialties, as well as medical students. *Id*. at ¶¶ 31. Medcenter maintained the Physicians Database in a Microsoft SQL database structure and updated and organized the data fields that included extensive non-public granular data on physicians. *Id*. ¶ 33. At its peak in early 2016, Medcenter possessed this granular data on about

2

420,000 medical professionals across at least 58 distinct medical specialties, which reflected "enormous value as a proprietary trade secret" to Medcenter. *Id*. at ¶ 40. As a result, Medcenter tightly restricted access to the Physicians Database, only allowing one Medcenter employee database manager named Carlos Padilla to have full access from 2014 to 2016 and some "senior community managers to have limited access rights." *Id*. at ¶¶ 42-44. Not even the CEO of Medcenter Holdings and Medcenter Argentina, Daniel Sanmarco ("Sanmarco"), had access rights to the Physicians Database. *Id*.

The "Salesforce Database" was used to distribute invitations to medical professionals in the Physicians Database to participate in a program to deliver information about pharmaceutical products that pharmaceutical companies paid Medcenter to advertise. *Id*. at ¶¶ 45-48. As of mid-2016, Medcenter's primary revenue driver was engagements by Pharma Clients to create and execute these structured drug and medical product marketing programs called "Directed Projects" that targeted specific physicians by practice specialty throughout Latin America. *Id*. at ¶¶ 45-46. Medcenter's most critical asset for contracting with Pharma Clients for Directed Projects was its ability to access detailed information concerning Latin American physicians' prescribing behavior and for Medcenter's Pharma Clients to account for that information when developing and executing marketing activities, as well as Medcenter's ability to deliver targeted Pharma Clients' messages to physicians in the Physicians Database that may influence the physicians' prescribing behavior. *Id*. at ¶ 51.

After Medcenter disseminated information about a pharmaceutical product for a Directed Project to targeted physicians through the Salesforce Database, the physicians could respond to the marketing messages, which provided "useful data and feedback" to Medcenter. *Id*. at ¶ 54.

"All this unique pharmaceutical drug and medical product project performance data was stored in Medcenter's Salesforce Database, which was a secure hosted online platform." *Id.* at ¶ 55. Only Sanmarco and Estefania Aristu, who was the Salesforce Database administrator for all of Medcenter starting in 2003 or 2004, had the access password keys to the Salesforce Database. *Id.* at ¶¶ 60-61. Plaintiffs allege that Defendants conspired together to poach Aristu in June 2016 and that before she left to work for Defendants, she stole "extensive amounts" of data from the Physicians Database and the Salesforce Database and provided this data to Defendants. *Id.* ¶¶ 3-5. While Aristu did not have access to the Physicians Database, Plaintiffs allege that Aristu was able to "request information from the Physicians Database on an as-needed basis from other Medcenter senior community managers." *Id.* at ¶ 71.

Plaintiffs also allege that in May 2016, Sanmarco provided Aristu with the Salesforce Database access key before she attended a Miami conference and that she used this to "access, download, retain and steal substantial amounts of confidential Medcenter data on all ongoing Directed Projects that were in process as of June 2016." *Id.* at ¶¶ 131-33. Medcenter revoked all of Aristu's "database access credentials" when it became aware of her departure from Medcenter in June 2016. *Id.* at ¶ 152. Medcenter further alleges that Aristu's transfer of information from these databases to Defendants constituted a theft of trade secrets that quickly devastated Medcenter's business, but that Medcenter only began to suspect this that Aristu had stolen this data in the fall of 2017 and had disclosed it to the Defendants as part of a conspiracy between her and the Defendants. *Id.* ¶¶ 6-9.

During the first three quarters of 2017, Plaintiffs allege that Medcenter lost clients and that Defendants took over "at least nine Directed Projects, which Aristu personally had been in charge of at Medcenter" in October 2017. *Id.* at ¶ 168. It was not until this point that Medcenter

4

contends it "learn[ed] that any of the WebMD Defendants had in fact misappropriated its trade secrets . . . , when it discovered that all of its pending Directed Projects had in fact been taken over by what it believed to be Medscape." *Id*. at ¶ 175. Medcenter also alleges that "[t]he loss of all pending Directed Projects . . . by late 2017 had the effect of stopping . . . all of Medcenter's business development and anticipated revenues[] and resulted in the eventual financial collapse of Medcenter's entire business." *Id*. at ¶ 177. Medcenter further alleges that Defendant WebMD breached an NDA on March 3, 2014, which prohibited WebMD from using covered "confidential information . . . for any purpose other than evaluation" of the potential acquisition. *Id*. at ¶ 88. As a result of the contract, WebMD requested and received information about various key employees, including Mariel Aristu and Estefania Aristu. *Id*. at ¶¶ 93-94. Using "the confidential employment and related information [WebMD] had acquired under the NDA," Medcenter alleges that Defendants WebMD and Medscape "began aggressive attempts to recruit various Medcenter key employees and officers", including targeting of Estefania and [Mariel] Aristu." Id. at ¶¶ 108, 113, 120, 217.

## PROCEDURAL HISTORY

On January 3, 2020, the Plaintiffs filed the original complaint. ECF No. 1. On June 5, 2020, the Plaintiffs filed the FAC. ECF No. 18. On July 13, 2020, Defendants filed a motion to dismiss. ECF No. 26. On March 29, 2021, this Court denied the Defendants' motion to dismiss. ECF No. 33.

On February 27, 2023, Defendants filed a motion for sanctions pursuant to Fed. R. Civ. P. 26 and 37 for spoliation of evidence. ECF No. 73. On September 14, 2023, Magistrate Judge Gabriel W. Gorenstein granted in part and denied in part, specifically granted to the extent that

5

Plaintiffs are precluded from presenting evidence as to the nature or value of the Non-Contact Data because of its spoilation of the evidence. ECF No. 96.

On July 22, 2024, Defendants filed a motion for summary judgment. ECF No. 131. On October 9, 2024, Plaintiffs filed a memorandum of law in opposition to the motion for summary judgment. ECF No. 147. On November 26, 2024, Defendants filed its reply memorandum of law in support for the motion for summary judgment. ECF No. 148. The Court considers this motion fully briefed.

## STANDARD OF REVIEW

Summary judgment shall be granted where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.,* 748 F.3d 120, 123–24 (2d Cir.2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir.2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1,* 16 F.Supp.3d 294, 314 (S.D.N.Y.2014) (same). Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.,* No. 13–CV–230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for

trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP,* 735 F.3d 114, 123 (2d Cir.2013) (alterations and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion ..., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cnty. of Erie,* 692 F.3d 22, 30 (2d Cir.2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York,* No. 11–CV–2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading....")).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of N.Y.,* 746 F.3d 538, 544 (2d Cir.2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod,* 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* MDL No. 1358, No. M21–88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "'to isolate and dispose of factually unsupported claims.'" *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.,* 386 F.3d 485, 495 (2d Cir.2004) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986)).

**DISCUSSSION**

I.  **Trade Secret Claims**

This Court grants summary judgment on the Plaintiffs' trade secrets claims. "The DTSA provides a private right of action for '[a]n owner of a trade secret that is misappropriated ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *Zabit v. Brandometry*, LLC, 540 F. Supp. 3d 412, 419 (S.D.N.Y. 2021) (brackets and ellipsis in original) (quoting 18 U.S.C. § 1836(b)(1)). To prevail on its claim for trade secret misappropriation under the DTSA, a plaintiff must prove that "(1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *Democratic Nat'l Comm. v. Russian Fed.*, 392 F. Supp. 3d 410, 447 (S.D.N.Y. 2019) (internal quotation marks omitted); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, No. 15 Civ. 211 (LGS) (SDA), 2020 WL 1442915, at *8 (S.D.N.Y. Jan. 27, 2020), report and recommendation adopted, 2020 WL 1911205 (S.D.N.Y. Apr. 20, 2020).

DTSA claims are subject to a three-year statute of limitations. *See* 18 U.S.C. § 1836(d). The statute of limitations runs from the date on which the misappropriation to which the action would relate "is discovered or by the exercise of reasonable diligence should have been discovered." *Uni-Systems, LLC v. U.S. Tennis Ass'n, Inc.*, 350 F. Supp. 3d 143, 178 (E.D.N.Y. 2018). In other words, the limitations period begins to run when the plaintiff "knew or should have known that the alleged trade secrets were wrongfully acquired, disclosed, or used." *Id*. "New York law governing the accrual of statutes of limitations is less permissive for plaintiffs than the law under the DTSA." *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 461 (S.D.N.Y.), aff'd, 838 F. App'x 582 (2d Cir. 2020). While "New York trade secret misappropriation claims are governed by [a] three-year statute of limitations," *Architectonics, Inc. v. Control Sys.*, 935 F. Supp. 425, 432 (S.D.N.Y. 1996) (citing C.P.L.R. § 214(4)), the accrual date is not based on

notice. Instead, under New York law, "a claim ... 'accrues either when defendant discloses the trade secret or when he first makes use of plaintiff's ideas.'" *iSentium, LLC v. Bloomberg Fin. L.P.*, No. 17-CV-7601 (PKC), 2020 WL 248939, at *8 (S.D.N.Y. Jan. 16, 2020) (quoting *Inspired Capital. LLC v. Conde Nast,* 2019 WL 2191249, at *5 (S.D.N.Y. May 21, 2019)). "'The date of accrual may be extended under the continuing tort doctrine where the defendant has kept a secret confidential but continued to use it for commercial advantage. Where, however, the defendant discloses the secrets revealed to him, there can be no continuing tort of unlawful use.'" *Id*. (quoting *Synergetics USA, Inc. v. Alcon Labs., Inc*., 2009 WL 2016872, at *2 (S.D.N.Y. July 9, 2009)).

This Court finds that the Plaintiffs' trade secrets claims are time barred by the applicable statute of limitations. Defendants argue the Plaintiffs' trade secrets claims are time-barred because Plaintiffs waited until January 2020 to file the instant action even though the September 1, 2016 shareholder meeting authorized the engagement of counsel to pursue claims against Defendants for theft and use of its confidential information, demonstrating that the Plaintiffs had notice or should have known of trade secrets claims. ECF No. 132 at 23; *see also* ECF No. 148 at 12 n. 8. Defendants also maintain that following their suspicion of Aritsu's theft and use of confidential information, Medcenter threatened to sue and formally authorized the engagement of counsel in August/September 2016. ECF No. 132 at 42. Plaintiffs argue that they did not have actual knowledge of their trade secrets claim until at least October 2017 when Medcenter executives saw a series of digital advertisements that Defendant Medscape posted on its website from January 11, 2017 through October 26, 2017. ECF No. 147 at 28. They also argue that the continuing tort doctrine applies under New York law because Defendant WebMD made use of Medcenter's trade secrets up until at least March 2017. ECF No. 147 at 40-41.

Here, the date on which the alleged misappropriation of trade secrets "by the exercise of reasonable diligence should have been discovered" has passed. 18 U.S.C. § 1836(d). The test for whether a DTSA claim is time-barred does not require actual knowledge, only that the plaintiffs "should have known" of the trade secret misappropriation. *Uni-Systems*, 350 F.Supp.3d at 178. To demonstrate that Medcenter had notice or should have known of trade secrets claims, Defendants point to the September 1, 2016 shareholder minutes that state:

> Medcenter passed another resolution that said such things as, "Vice President [Mariel] . . . had [a database] **known as salesforce.com** under her direct control and management, on which system were registered all of the company's products and services, all of its commercial proposals" and "***making use of it***, she took advantage of it and began contacting clients of Medcenter Solutions SA with proposals aimed at preventing the completion of agreements the company was about to make with them. . . . **[T]he possession and utilization by her and her new employer** of sensitive information protected under commercial and tax secrecy *laws* in prejudice of Medcenter Solutions SA."

ECF No. 132 at 39; *see also* Statement of Undisputed Material Facts ("SUF") ¶ 22. Shareholder meeting minutes from September 16, 2016 further state:

> The shareholders of Medcenter Argentina resolve that Medcenter's "assets, reputation, and economic viability" were directly damaged because "Ms. Mariel Aristu [joined the competition] and . . . ***provided [the competition with] sensitive data protected by fiscal and commercial secrecy,*** *as demonstrated by documentation provided by clients*."

ECF No. 132 at 39; *see also* SUF ¶ 230. On October 3, 2016, in an email:

> Sanmarco wrote to lawyers being considered that Mariel "**used confidential information** -- confidential information on negotiations with clients in order ***to favor her new employer***. . . . As a consequence of this, Medcenter is at the brink of bankruptcy."

ECF No. 132 at 39; *see also* SUF ¶ 232. Defendants also highlight that Medcenter employee Federico Testagrossa, former Medcenter operating officer, testified that by September 2016, the

10

company already believed that Mariel was using its trade secrets at WebMD. *See* SUF ¶¶ 229-230 (Testagrossa Tr. 268:17-269:9; Ex. 83).

In their opposition brief, Plaintiffs argue that these documents "are either irrelevant or otherwise only related to Plaintiffs' claim for breach of the NDA or Mariel's breach of her own confidentiality and fiduciary obligations to Medcenter", further illustrating that Defendants are using these documents "completely out of context." ECF No. 147 at 37. Plaintiffs address each of the foregoing documents and argue:

> The September 1, 2016 shareholder minutes of Medcenter Argentina do not reflect that the shareholders "authorized the engagement of counsel to sue Mariel and WebMD for…" theft of trade secrets. The minutes related in part to Mariel's historical exposure to Medcenter Argentina's commercial, economic, financial and strategic decisions, her control and management of the Salesforce system, and her coordination of commercial activities for Medcenter. The minutes also reflect that Mariel was removed as Vice President of Medcenter Argentina. Nothing in these minutes referred to WebMD accessing and using Medcenter's trade secrets. The minutes referred to Medcenter's confidential financial and tax information that Medcenter believed Mariel had been using for WebMD's benefit to badmouth Medcenter. The reference to hiring attorneys referred in context to pursing claims against Mariel.

ECF No. 147 at 39; *see also* CS ¶ 490-92. In response to the reference to the September 16, 2016 shareholder meeting, Plaintiffs also argue:

> The references in the September 16, 2016 shareholders meeting minutes to "sensitive data protected by fiscal and commercial secrecy" and "confidential information" had nothing whatsoever to do with Medcenter's trade secrets, including any data or information from Medcenter's Salesforce database and/or database of physicians in LATAM, but to Mariel badmouthing Medcenter.

ECF No. 147 at 39; *see also* CS ¶¶ 494-96. In response to the reference to the October 3, 2016 email, Plaintiffs argue:

> Sanmarco sent an email to Medcenter's Argentine attorney addressing a labor claim fabricated by Mariel after she left Medcenter. The statements in the email were in the context of Mariel taking commercial and tax secrecy information and

11

>contacting clients to badmouth Medcenter, but had nothing to do with Medcenter's trade secrets.

ECF No. 147 at 39; *see also* CS ¶ 500.

These events and evidence concerning Aritsu's alleged use of confidential information and sensitive data protected by "commercial secrecy" laws commenced the statute of limitations for the Plaintiffs' trade secret claims starting in September 2016. Accrual of the statute of limitations begins when "a reasonably diligent person in plaintiff's position would have been put on inquiry as to the" claim. *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 50 (2d Cir. 2019) (quoting *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992)). Any definition of "reasonable diligence" would encompass the duty to discover alleged wrongdoing at the time in which a self-described "clear and unmistakable marker" of alleged theft. *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 460 (S.D.N.Y.), aff'd, 838 F. App'x 582 (2d Cir. 2020). Contrary to the Plaintiff's assertion that these documents do not concern trade secrets and instead refer to breach of the NDA or confidentiality obligations, this Court's plain reading of the September 2016 shareholder minutes that state the words "commercial . . . secrecy laws" refers to trade secrets. ECF No. 132 at 39; *see also* SUF ¶ 230.

Nor is it relevant as to whether the Plaintiffs had actual notice of the trade secret misappropriation until the fall of 2017. Plaintiffs argue that they have offered proof that it was not until Medcenter viewed the nine Medscape advertisements that they were put on notice that WebMD had likely stolen its trade secrets. ECF No. 147 at 40; *see also* CS ¶ 517. The Plaintiffs inappropriately rely on when they had actual notice. Instead, the test is whether the Plaintiff's "should have known that the alleged trade secrets were wrongfully acquired, disclosed, or used." *Uni-Systems,* 350 F.Supp.3d at 178. Based on a review of contemporaneous writings produced during discovery and testimony from Testagrossa, a reasonably diligent person should have been

12

put on inquiry notice that Medcenter had trade secrets claims against Mariel and WebMD more than three years before this case was filed.

The continuing tort doctrine also does not apply where the Plaintiff had knowledge of the defendant's misappropriation and disclosure of its trade secrets. *Synergetics USA, Inc.*, 2009 WL 2016872, at *2. Where the Defendant discloses the secrets revealed to him, "there can be no continuing tort of unlawful use." *iSentium, LLC v. Bloomberg Fin. L.P.*, No. 17-cv-7601 (PKC), 2020 WL 248939, at *8 (S.D.N.Y. Jan. 16, 2020) (quoting Synergetics USA, Inc. v. Alcon Labs., Inc., 2009 WL 2016872, at *2 (S.D.N.Y. July 9, 2009)). "Thus, the statute of limitations began to run when Plaintiff knew or should have known that the alleged trade secrets were wrongfully acquired, disclosed, or used." *Uni-Sys., LLC v. United States Tennis Ass'n, Inc.*, 350 F. Supp. 3d 143, 178 (E.D.N.Y. 2018). Here, the September 2016 shareholder meeting minutes make clear that the Plaintiff was aware that Medcenter was directly damaged because Aristu provided [the competition with] sensitive data protected by fiscal and commercial secrecy, as demonstrated by documentation provided by clients." ECF No. 132 at 39; *see also* SUF ¶ 232. Based on Medcenter's knowledge that Aristu disclosed these trade secrets to competitors, the statute of limitations clock started at least as early as September 2016. Therefore, the federal DTSA claims are barred by the relevant statutes of limitations.

## II.  **Breach of Contract**

This Court denies summary judgment on the Plaintiffs' breach of contract claim against Defendants. Under New York law, a plaintiff alleging the breach of a contract is required to show: (a) the existence of an agreement; (b) the plaintiff's adequate performance of that agreement; (c) a breach by the defendant; and (d) damages. *See Williams v. Time Warner Inc.*, No. 09 Civ. 2962(RJS), 2010 WL 846970, at *6 (S.D.N.Y. Mar. 6, 2010). There is no dispute

between the parties as to the first two elements of the breach of contract claim. Here, the relevant agreement is the NDA that was signed on March 3, 2014 between Medcenter and WebMD in advance of due diligence that was performed for a possible acquisition of Medcenter by WebMD that never materialized. ECF No. 132 at 11; *see also* SUF ¶¶ 98-100. The remaining questions are (1) whether Defendants breached the confidentiality provision of the NDA that enabled Defendants to poach Medcenter employees and clients, including hiring Mariel and Estefania Aristu in spring 2016; and 2) whether Plaintiffs can prove damages related to their breach of contract claim. ECF No. 132 at 11. This Court will analyze each question in turn.

     i.    *Breach*

Plaintiffs allege that under the terms of the NDA, and in express reliance on the NDA, Medcenter disclosed to WebMD extensive non-public confidential information and details about its business, contracts, Pharma Clients, Physicians Database, Salesforce Database, and its key employees and country managers. ECF No. 18 at ¶ 209. Plaintiff maintains that Medcenter permitted WebMD Health Corp. and its representatives to interview Medcenter's key employees and country managers, including Aristu and Estafania. *Id*. at ¶ 210. Plaintiff alleges that Defendant used the confidential information that it learned during the due diligence process about Medcenter's key employees to arrange to have them poached and hired by Medscape or WebMD Global, as part of their alleged scheme to steal and carry out Medcenter's Latin American business for WebMD Health Corp.'s affiliates once these employees were hired. *Id*. at ¶¶ 216-217. Defendant argues that there is no proof that Medcenter provided confidential employee information about its personnel during due diligence that was protected by the NDA or alleged confidential information that was divulged which Defendant could have discovered from public sources, including LinkedIn. ECF No. 132 at 11, 42.

This Court declines to grant summary judgment where there is a genuine issue of material fact for the jury as to whether the Defendants breached the NDA by using confidential information learned during due diligence to poach key employees or whether they learned about Medcenter's business and employees during the period of the Collaboration Agreement, or from LinkedIn. *Medcenter Holdings Inc. v. WebMD Health Corp*., No. 1:20-CV-00053 (ALC), 2021 WL 1178129, at *7 (S.D.N.Y. Mar. 29, 2021) ("[T]he claim seems to be that WebMD Health Corp used information acquired pursuant to the NDA about Medcenter's operations to target employees for poaching. Whether this is so, or these people were simply found on LinkedIn or through the course of WebMD Defendants and Medcenter collaborating, as WebMD Defendants contend, is a question of fact.") Here, the NDA expressly provided that "Medcenter Confidential Information…will not be disclosed or divulged by WebMD to anyone" other than to WebMD Health Corp.'s "employees, officers, directors, advisors and agents" having a need to know such information solely in connection with the potential acquisition of Medcenter. ECF No. 18 at ¶ 219.

Plaintiffs maintain that they have proffered evidence that WebMD was provided access to Mariel and Estefania and given confidential information during due diligence regarding client projects that Mariel worked on. ECF No. 147 at 42; CS ¶¶ 273-74, 295-97. Defendants, however, argue that they had worked closely with Plaintiffs from 2007 to 2012 pursuant to the terms of a Collaboration Agreement (the "Collaboration Agreement"), which resulted in Defendant becoming well acquainted with Mariel Aristu. *Id*. The Collaboration Agreement contained a non-solicitation provision that stated:

> WebMD acknowledges that Medcenter's employees are valuable business assets, and WebMD agrees that during the Term of the Agreement ***and for a period of two (2) years from the date of termination of the Agreement***, it and each of its Affiliates shall not (for itself or for any third party) solicit or encourage any

15

> employee of Medcenter or its Affiliates that it has met as a result of the performance of this Agreement (a "Protected Individual") to terminate their employment with Medcenter or such Affiliate.

SUF ¶ 77. The Collaboration Agreement was terminated on March 12, 2012, so the non-solicitation provision expressly expired on March 12, 2014, two years after that agreement was terminated. SUF ¶¶ 83-84, 86. Given that the NDA did not have a non-solicitation provision, Defendant WebMD argues that they were free to hire Mariel and Estefania in spring 2016. *Id*. Defendants also claim that WebMD learned all about Medcenter's business and its employees solely from LinkedIn or an earlier collaboration. ECF No. 147 at 17.

Defendants' argument that the absence of a non-solicitation clause from the NDA allows them to hire the Aristus is misleading. The Plaintiff is not arguing that Defendants were prohibited from hiring Medcenter's employees. Rather, the Plaintiffs maintain that WebMD breached the NDA by using the confidential information it learned from Medcenter during the due diligence period to poach key employees. For example, during the course of the WebMD acquisition due diligence, Plaintiff argues that Medcenter provided to WebMD confidential information from its Salesforce database reflecting its historical revenues received from its pharma clients in LATAM from January 1, 2011 through mid-April 2014 deriving from projects with some of the world's largest pharmaceutical and medical companies. CS at ¶ 273. As part of the due diligence process, Medcenter also allegedly disclosed to WebMD a Salesforce report containing details on all of Medcenter's pending pharma client projects as of April 18, 2014, that were then being negotiated and in phases 3 and 4, including the client names and projected revenues. *Id*. at ¶ 274. Detailed "case studies" for Mariel were also allegedly shared with WebMD and contained details about specific pharma company marketing projects for which she had been responsible. *Id*. at ¶ 463. A reasonable jury could conclude that Defendants used this

16

information to decide to go after Medcenter's business and customers, as well as poach their employees like the Aristus.

    *ii.     Damages*

"The proper measure of damages for breach of contract is the amount necessary to put the plaintiff in as good a position as he would have been if the defendant had abided by the contract." *Millgard Corp. v. E.E./NAB/Frontier Kemper*, 329 F. App'x 307, 310 (2d Cir. 2009) (quoting *Western Geophysical Co. of Am., Inc. v. Bolt Assocs., Inc.*, 584 F.2d 1164, 1173 (2d Cir. 1978)). To succeed under a lost asset value theory, Medcenter must both (1) demonstrate with certainty that the lost asset value was caused by the breach and (2) establish that the damages were fairly within the contemplation of the parties at the time they entered into the Agreement. *Id.* (citing *Kenford Co. v. Cty. Of Erie*, 67 N.Y.2d 357, 261 (1986); *see also Nina Indus., Ltd. v. Target Corp.*, No 04 Civ. 2540 (JSR), 2005 WL 323745, at *2 (S.D.N.Y. Feb. 8, 2005).

This Court finds that the issue of damages for the breach of contract claim is a matter best left for a jury to decide. As an initial matter, in light of the foregoing granting summary judgment and dismissing the Plaintiff's DTSA claims as time-barred, this Court declines to analyze whether Medcenter can prove damages for their trade secrets claims. Here, Plaintiffs seek "upwards of $45 – $50 million" for alleged lost enterprise value for the Trade Secrets and/or NDA claims. ECF No. 18 at ¶ 106. With respect to their breach of contract claim, Plaintiffs argue that they are entitled to consequential damages in the amount of their enterprise value. ECF No. 147 at 45; *see also* ECF No. 18 at ¶ 221. In opposition to the instant motion for summary judgment, Plaintiffs maintain that Medcenter has provided evidence that "WebMD valued its business at $15 million before WebMD caused the destruction of Medcenter's entire business by usurping its key employees in violation of the NDA and luring away Medcenter's

clients by acquiring and using Medcenter's own trade secrets." ECF No. 147 at 44; *see also* CS ¶¶ 441, 443, 447. In support of this valuation, Plaintiffs highlight a proposed expression of interest letter for $15 million that WebMD drafted. ECF No. 147 at 47; *see also* CS ¶ 444.

To recover consequential "damages for breach of contract under New York law, a plaintiff must show: 1) the damages were caused by the breach; 2) the damages are provable with reasonable certainty; and 3) the damages were within the contemplation of the parties at the time of the contract." *Atias v. Sedrish*, 133 F. App'x 759, 760 (2d Cir. 2005). Plaintiffs rely on *Vianet Group PLC v. Tap Acquisition, Inc. to* argue that because what Plaintiffs have shown goes beyond breaching the contract but "extends to a larger scheme or plan to hire away executive staff and go after customers on a scale that would have the foreseeable result of complete enterprise collapse…[Plaintiffs] have established a genuine issue of material fact exists as to whether [Medcenter's] damages for [its] full enterprise value were the foreseeable consequence of [WebMD's] breach." *Vianet Grp.*, 2016 WL 4368302 at *28 (N.D. Tex. Aug. 16, 2016). Defendants argue that Plaintiffs cannot prove damages because Medcenter has no valuation expert, nor any admissible evidence to prove enterprise value as of 2016. ECF No. 148 at 10. For breach of contract claims, however, there is no absolute requirement that a Plaintiff use an expert to prove damages, but rather that damages are subject to proof by a reasonable certainty. Accordingly, where there is a genuine issue of material fact as it relates to whether there was breach of contract and what amount of damages, if any, should be awarded, this Court will deny summary judgment on Plaintiffs' breach of contract claim.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED in part and DENIED in part**. The Clerk of Court is respectfully directed to terminate ECF No. 131.

**SO ORDERED.**

**Dated:** **March 31, 2025**
       **New York, New York**

_____
       **ANDREW L. CARTER, JR.**
       **United States District Judge**